No. 12093

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

---

ROBERTS REALTY CORPORATION,
a Montana Corporation,
ELIZABETH B. ROBERTS and MILTON L. ROBERTS,

Plaintiff and Respondent,

-vs-

CITY OF GREAT FALLS,
a Municipal Corporation,

Defendant and Appellant.

---

Appeal from: District Court of the Eighth Judicial District,
Honorable Truman G. Bradford, Judge presiding.

Counsel of Record:

For Appellant:

Donald J. Hamilton, Great Falls, Montana.
Jardine, Stephenson, Blewett and Weaver, Great Falls,
Montana.
L. Morris Ormseth argued, Great Falls, Montana.

For Respondent:

Swanberg, Koby and Swanberg, Great Falls, Montana.
Gorham Swanberg argued, Great Falls, Montana.

---

Submitted: June 16, 1972

Decided: SEP 6 1972

Filed: SEP 6 1972

*Thomas J. Kearney*
Clerk

Mr. Chief Justice James T. Harrison delivered the Opinion of the Court.

This is an appeal by the City of Great Falls from a judgment entered in the district court of Cascade County upon a jury verdict in favor of the plaintiffs in the amount of $15,894.

The record discloses that this action arose out of water damage to plaintiffs' real property located in downtown Great Falls caused by the bursting of an adjacent water main. Specifically, the break occurred at approximately 2:55 p.m. on January 25, 1969, and flooded the basement of the Maverick Bar, located at the corner of Central Avenue and Second Street. The main precipitating the flood was a 12" cast iron distribution line installed by the City in 1930 along Second Street between First Avenue South and First Avenue North.

From the time the break occurred until the City finally succeeded in shutting off the water at approximately 4:35 p.m., it is estimated that one and one-quarter million gallons of water escaped the main. Most of this amount coursed through the basement of the Maverick Bar, beneath the sidewalk, and up through heavy iron loading doors in the sidewalk with such force that water spouted three feet above the sidewalk level. Even after the main was shut off, the City water department had to continue pumping water from plaintiffs' basement until the early morning hours of the following day. The following sequence of events transpired from the time of the break until the water was shut off.

Donald Sponheim, plaintiffs' tenant, observed water rapidly filling the Maverick's basement almost immediately after the break occurred at 2:55 p.m. He tried to call the Great Falls City water department at the time of his discovery; despite letting the phone ring probably eight, nine, or ten times, he received no answer. Sponheim next called both the police and fire departments for emergency assistance. The police were then able to contact a water department employee, Sulo Korin, via two-way radio and inform him

- 2 -

of the location of the break.  Korin, the water plant operator, had been observing a pressure recordation device prior to the time of the police call and had observed a drop in pressure about 2:55 p.m. but was unable to direct a response to it because the recordation device does not indicate where the loss of pressure has occurred.

Another City water department employee, Charles Wombold, overheard the radio conversation between the police and Korin whereupon he left his work elsewhere in the city and drove to the scene of the break.  Wombold testified he arrived at the scene within four minutes after hearing the radio conversation.  In about 15 minutes other city employees arrived to help Wombold at the valve in the First Avenue South-Second Street intersection.

Jack Boettcher, a foreman for the water department also arrived in the area of the break during the time Wombold was working on one of the valves.  Boettcher proceeded to another valve on the broken main, located at the intersection of Central Avenue and Second Street, and with the help of other water department employees tried to shut off the flow of water through that valve.  Since the Great Falls water delivery system mains are laid out as a grid system, it was necessary to shut two valves in the main to isolate the break.

The record indicates that due to accumulated ice and snow on the street, the frozen valve gates would not budge for anyone using only a hand key, hand key with extension arm "cheaters", or even a power-assisted key. In fact, no progress was made toward closing either of the valve gates until one of Boettcher's assistants suggested they go to the city distribution shop at Ninth Street and First Avenue South and bring back a heating device, called a steamer, to thaw the frozen valve gates.  After the steamer was obtained and used on each valve gate, the city crews were able to close the gates and isolate the break.

Boettcher testified it never occurred to him that a steamer would be

necessary to shut the valves.

As a result of the foregoing events, the basement of plaintiffs' Maverick Bar was immediately flooded and remained inundated for at least nine hours and perhaps for as long as thirteen or fourteen hours.

The history of the particular section of main in question, laid in 1930, includes two previous breaks. One major break occurred in 1957, approximately seventeen feet from the 1969 break. Another break occurred in 1962.

One of defendant's witnesses, Delbert Brick, the Great Falls water and sewer department commissioner, testified that sixty years would be considered a minimum lifespan for such mains. Although the two prior breaks occurred when the pipe was only halfway into its minimum lifespan, there were apparently no tests or laboratory analyses made to determine the cause of failure. Defendant City introduced no evidence of such tests. In fact, the testimony of the City's witnesses shows that the City has no standard procedure or checklist to follow in the local examination of main breaks which would enable the City to determine the actual condition of the pipe. The record shows that tests simply are not performed on removed defective pipe. Testimony for the City did indicate that visual inspection for corrosion was made at the time of making service connections and making repairs to the mains. There was admission on the part of the city, however, that even when local, visual inspection of the defective pipe is made, no written reports on the condition of the broken pipe are kept.

Although at one time a map of all breaks was kept by the City , this map was discontinued sometime prior to 1968. The only way records of water main breaks may be found today is by examining water department repair orders, which are kept in chronological order only and cover the whole city, without grouping of breaks by mains or area.

One of plaintiffs' witnesses, a water department employee, testified

- 4 -

at trial that the water department repair orders disclosed the existence of approximately twenty breaks in the downtown area, particularly in a six-block by two-block retangle encompassing the main in question, in the past ten years. It took the employee about three days to locate the number of breaks recorded for the particular area. He admitted on questioning by the City that this list of "breaks" included repairs to minor leaks not requiring replacement of the main. A civil engineer and former public works director for the City of Great Falls testified that such history of breakage in this area would indicate to him that the piping should be replaced. One of defendant's own expert witnesses, Edward Nurse, stated that such was an unusually high number of breaks in a small area. Nurse, however, stated that such breakage would not indicate replacement.

Delbert Brick, the present water commissioner, stated the City's replacement formula called for installation of new pipe when the " * * * annual cost of repairing the breaks becomes greater than the annual cost of replacing the main * * *". The City did not enter evidence, however, regarding the cost of repairing any particular main in Great Falls or for the City as a whole. Neither did defendant produce testimony regarding how many breaks are necessary before the repair cost begins to exceed replacement cost.

Both the City and plaintiffs entered conflicting expert testimony regarding the type and classification of the main in issue and the nature of manufacturing defects alleged to be incorporated into the pipe. Experts for both sides made laboratory analyses of sections from the broken main in order to determine the cause of the January, 1969, break.

Richard Holt, plaintiffs' expert metallurgical engineer, testified that the cause of the break was a slag inclusion in the pipe at the time it was cast by the pit cast method. He stated that the slag inclusion reduced the strength of the pipe wall below specifications. The City had apparently

ordered Class 150 cast iron pipe in 1930. The pipe was supposed to withstand 150 pounds per square inch. Holt found that the pipe actually failed to reach minimum standards for Class A pit cast pipe, 43 pounds per square inch. The average working pressures in Great Falls vary between 80 and 90 pounds per square inch.

Plaintiffs' expert engineer further testified that the pre-existing defect could have been detected by an adequate inspection prior to the time it was laid.

Holt found the average life expectancy for this type of pipe to be forty years, and that a history of thirty-nine years in the ground plus two previous breaks would provide strong indication for replacement. It was his opinion that the existence of records of previous breaks "would be of great value" in determining how rapidly the pipe was deteriorating.

In most details, Holt's testimony was squarely contradicted by defendant's expert, Charles Avery, who stated that the pipe was centrifugally cast rather than pit cast and thus had greater wall strength than pit cast pipe of similar thickness. Avery came to the conclusion that the most probable cause of the break "is the pipe reaching the limit of its service life under the existing soil and water conditions * * *".

Both plaintiffs' experts and the City's water commissioner agreed that it is desirable to place granular bedding or cushioning materials under the pipe at the time of installation to prevent damages from ground movement, shock, and corrosion. The record shows, though, that the pipe in question was laid without the use of any cushioning material.

When questioned regarding whether private landowners had ever repaired breaks in Great Falls water mains and regarding who had authority to make such repairs, Brick testified that private landowners had not made such repairs, that the City makes all service connections to the mains, that the City repairs breaks in the mains, and that furthermore, the Great Falls water

- 6 -

department has the sole and exclusive jurisdiction over the city water mains.

Finally, we note the testimony by Brick regarding the ability of the City to carry out its stated water main replacement policy.

"Q. Now, just before the hearing on that water rate increase you were quoted by the Tribune, under date of February 18, 1968, as saying: 'We just don't have enough gross revenue to operate the Water Department properly. We're not keeping up with the system's needs.' Were you properly quoted there, Mr. Brick? A. I would say I was.

"Q. That was your belief at that time, was it? A. It's my belief now."

At the close of plaintiffs' case and again at conclusion of the trial, defendant City moved for a directed verdict and the motions were denied. Following an adverse jury verdict, defendant moved for judgment notwithstanding the verdict or for a new trial. Again the motions were denied.

Four issues are presented for review. Even though one of the issues hereinafter set forth requires reversal and remand for a new trial, we nevertheless find it essential to discuss each of the issues presented as well as that issue revealing prejudicial error. In other words, we find that a consideration of all alleged error is necessary by reason of the remand for new trial. See section 93-216, R.C.M. 1947 and Herrin v. Herrin, 103 Mont. 469, 63 P.2d 137.

Plaintiffs and defendant are in substantial agreement as to the framing of the latter three issues set forth below. They disagree markedly in the statement of the first issue and in their approach to argument of that issue. Therefore, we separately present plaintiffs' and defendant's characterizations of the first issue.

(1) The first issue concerns the giving of actual notice to the City and the City's knowledge of the defect by means of reasonable inspection.

(a) Defendant City states the issue as follows: Whether the court erred in denying defendant's motion for a directed verdict and for judgment notwithstanding the verdict because,

- 7 -

as a matter of law, the City did not have actual notice of any defect in the water main which caused plaintiffs' damage nor was its lack of knowledge the result of a failure to make a reasonable inspection;

(b) Plaintiffs characterize this issue:  Whether or not it is necessary to give the City notice of a defect in a buried water main;

(2)  Whether it was error to give the court's instruction No. 9 setting forth the res ipsa loquitur criteria;

(3)  Whether the City was negligent in the manner in which it shut off the escape of water from the broken main; and

(4)  Whether it was error to refuse to give defendant's proposed instruction number 8B concerning the standard of care to be exercised by operators of waterworks.

The first issue for review arises from the provisions of section 11-1305, R.C.M. 1947, the pertinent portion of which is as follows:

> "Defective highways and public works--notice of claims
> for injuries.  Before any city or town in this state
> shall be liable for damages to person and/or property
> for, or on account of, any injury or loss alleged to
> have been received or suffered by reason of any defect
> or obstructions in any bridge, street, road, sidewalk,
> culvert, park, public ground, ferry boat, or public
> works of any kind in said city or town, it must first
> be shown that said city or town had actual notice of such
> defect or obstruction * * * before such injury or damage
> was received * * *."

Defendant's proposed instruction No. 5, given without any objection as court's instruction No. 6, incorporated the above notice provision as well as certain Montana case law interpreting this statute.  The instruction reads:

> "Before any city can be liable for damages, for a loss
> received from a public works of the city, it must be
> shown that the city either had actual notice of the de-
> fect complained of, or, created the defective condition
> by its own act, or, should have known of the defect by

means of a reasonable method of inspection, and a reasonable opportunity to repair it before the damage was received. Therefore, unless it is established by a preponderance of the evidence that the city had such actual notice of the defective pipe, or created the defective condition by its own act, or should have discovered the defect by use of a reasonable method of inspection, and an opportunity to repair it before the piping caused the damage, the city cannot be liable."

There is no evidence in the record that the City had actual notice of the defective condition in this main prior to the break of January 25, 1969. The City further urges that the evidence will not support a finding that it created the defective condition by its own act or should have discovered the defect by use of a reasonable method of inspection.

Plaintiffs now argue for the first time on appeal that the actual notice requirement of section 11-1305, R.C.M. 1947, is not applicable to the breaking of a city water main. Plaintiffs claim that the City operates the water supply system as a proprietary, not governmental, function and that when so operating stands in the same shoes as any private corporation in similar factual circumstances.

Whatever merit plaintiffs' contention may have, we need not here consider the applicability of section 11-1305's actual notice requirement. The necessity of notice under section 11-1305 cannot now be treated as an issue because plaintiffs failed to raise an objection to the giving of defendant's proposed instruction No. 5. Plaintiffs' contention on appeal that notice is unnecessary is clearly an objection that defendant's proposed instruction does not state the law.

It is well-recognized by this Court that such objections must be raised with particularity at the time of trial or the opportunity is lost. As we stated in Seder v. Kiewit Sons' Co., 156 Mont. 322, 330, 479 P.2d 448:

" * * * Objections to instructions not raised in the trial court upon settlement cannot be raised for the first time on appeal." (Citing earlier Montana cases.) See also Rule 51, M.R.Civ.P.

- 9 -

Assuming that the jury followed the Court's instruction No. 6 and even if it concluded the City had no actual notice of the defect, it still had the opportunity to consider and find the existence of certain exceptions to the actual notice requirement.

In Floyd v. City of Butte, 147 Mont. 305, 412 P.2d 823, we noted one such exception to be that the municipality is charged with notice of what a reasonable inspection would disclose. Plaintiffs may thus prove that defendant did not make a reasonable inspection.

Here, there was ample evidence in the record, comprised of the testimony given by the water commissioner, from which the jury could determine that the City's method of inspection was not reasonable. We agree with the court's instruction No. 8 which states that a reasonably prudent water distributor need not regularly dig up and inspect its buried water mains. On the other hand, in regard to the actual method of inspection employed, Brick testified that when a piece of pipe is uncovered for repair, an "eyeball inspection" and the primary decision on replacement are made by "the man that is down in the ditch looking at the pipe". If subordinates cannot then come to a decision on whether a pipe should be replaced, the water commissioner is consulted. Yet the water commissioner stated he had no special training to determine the condition of pipe. The jury could find that defendant's method of visual examination for corrosion was haphazard. One of the City's witnesses also stated that there was no standard procedure or "count-off list" followed when pipes were examined at the time of the break. In short, the jury could have determined that a more precise and reasonable manner of inspection at the time of the 1957 and 1962 breaks of this main would have dictated replacement with consequent avoidance of the 1969 damage.

Another exception to actual notice set forth by the court's instruction No. 6 is the municipality's creating the defective condition by its own

act.  As we stated in Watson v. City of Bozeman, 117 Mont. 5, 13, 156 P.2d 178:

> "'Municipal corporations are chargeable with knowledge of their own acts, or those ordered by them; and there-fore whenever defective conditions in streets are due to the direct act of the municipality itself or of persons whose acts are constructively its own * * * no notice need be shown, or, as it is otherwise stated, notice of the defect is implied in such cases.
>
> "'The rule that notice is not necessary to charge a municipality with liability for defects due to its own direct act applies where the defect is one of original construction, as distinguished from a mere condition of repair * * *.  The fact that actual notice, as a condition of municipal liability, is expressly provided for by statute or municipal charter does not change the rule that notice is not necessary when the defective condition is due to the direct act of the municipality or of those acting by its authority, including cases of defects in original construction.'"  (Citing 43 C.J. 1042)

Here, as noted above, plaintiffs' expert metallurgical engineer gave his opinion and the jury could have believed that the cause of the break was due to a basic defect in manufacture and that the pre-existing defect should have been discovered prior to installation of the pipe.  Defendant's expert, Avery, reached opposing conclusions from examination of another section of pipe.  Clearly, fact questions for the jury are presented as to whether a reasonable method of inspection was followed by the City and regarding whether a defect in original construction existed.  Even though controverted by defendant, plaintiff's evidence presents competent theories in each instance.  When plaintiffs' evidence supports competent theories on questions of fact, the court below should not direct a verdict for defendant and thereby remove from the jury its fact finding power.  See Benner v. B. F. Goodrich Co., 150 Mont. 97, 430 P.2d 648 and Vukmano-vich v. State Assur. Co., 82 Mont. 52, 264 P. 933.

Thus, we conclude that the court below did not err in denying de-fendant's motion for directed verdict and for judgment notwithstanding the verdict on the issue of notice and the exceptions to the notice requirement.

The second issue for review is whether the court erred in giving instruction No. 9 setting forth the _res ipsa loquitor_ doctrine for use with these facts.  For the following reasons, we conclude that it was error to give an instruction on _res ipsa loquitur_ in this case and that such error was prejudicial.

Plaintiffs' instruction, in summary, stated that the following must be found before an inference arises that the defendant was negligent:

(1)  The instrumentality was the proximate cause of plaintiffs' injury and damage;

(2)  The instrumentality was in the possession or exclusive control of defendant at the time;

(3)  That the occurrence was one of such nature that it does not happen in the ordinary course of things so long as the party in control uses ordinary care; and

(4)  That the circumstances were not then and are not now such that plaintiffs are in position to know what specific conduct brought about the injury.

Clearly, _res ipsa_ cannot apply to plaintiffs' theory that defendant negligently responded to the break itself.  All facts relating to abating the flow of water once the main break had occurred were obviously such that plaintiffs as well as defendant had equal access to the factual circumstances.

The only possible theory of plaintiffs' case to which the doctrine might apply is that which alleges negligence by the City in not replacing the main before the break occurred.  As a matter of law, the necessary third element of the instruction given, that the event does not ordinarily happen absent someone's negligence, was not demonstrated by plaintiffs.  On the contrary, the record here is replete with evidence that such breaks could occur absent any negligence.  Evidence from both parties' experts showed that the life expectancy of cast iron water pipe varied depending on the

- 12 -

corrosiveness of the soil.  Plaintiffs' witness Holt stated the average

service expectation to be about forty years.  Testimony showed the location

of corrosion damage to be almost impossible to determine.  Testimony further

showed that fracturing damage could occur from temperature variation of the

water flowing in the mains, impact from street traffic above the mains,

and from movement of ground water producing a varying water content in the

soil, thereby causing stress from soil expansion.  Thus, many causes of

pipe failure were demonstrated which have no relationship to negligence by

anyone.

In Fanning v. Montclair, 81 N.J.Super. 481, 196 A.2d 18, a water

main breakage case, the record did not disclose what caused the break, and

plaintiff suggested the existence of a defect when the main was originally

installed or, in the alternative, deterioration of the main over time.  The

court noted, however, that the cause might also have been completely un-

related to plaintiff's hypotheses in that a settlement of the earth itself

might have caused the break.  The appellate court upheld the trial court's

refusal to instruct on the doctrine of res ipsa loquitur with the observa-

tion at p. 20 of the opinion:

> "In any event, proof of the break in the main, without
> more, does not entitle plaintiff to an inference that
> the break was the result of some negligence on defend-
> ant's part."

In the appeal before us, we find the giving of the res ipsa instruc-

tion particularly prejudicial because the jury may have used the doctrine to

cast a presumption of negligence upon defendant when the evidence on the

issue of simple negligence was near equipoise.  We do not know on what find-

ings the jury based its general verdict.  We do know, however, that the

evidence of negligence presented by plaintiffs, contradicted by defendant,

was not so substantial that the rule of Jessen v. O'Daniel, 136 Mont. 513,

349 P.2d 107, would apply.  That rule provides that so long as substantial

evidence appears in the record to support the judgment, the judgment will

not be overturned on appeal even though the evidence is conflicting.

Therefore when a case has been submitted on an erroneous instruction, prejudicial as it was in this case to allow the jury to consider the use of res ipsa loquitur against the defendant, the judgment will be reversed. Where, as here, it is impossible to say upon what theory or under what part of the court's instructions a verdict is based, error in any one of the instructions which is prejudicial and which may influence the jury entitles the unsuccessful party to a new trial. Wolf v. O'Leary, Inc., 132 Mont. 468, 318 P.2d 582.

This brings us to the third issue for review: whether the City was negligent in the manner it shut off the water escaping from the broken main or was otherwise negligent. It is on the issue of negligence that the defendant is entitled to a new trial. The plaintiffs had two theories of negligence, one relating to the City's actions taken subsequent to the break and the other to the City's installation and maintenance of the pipe prior to the break, and presented evidence in support of each theory.

It should be noted that the court gave a general instruction on negligence which was not limited to a consideration of events surrounding the actual break of the main. The jury was free to consider any lack of ordinary care by the City resulting in damage to plaintiffs' property. For the reasons set out below, we find that on the new trial of the negligence issue, the jury should be allowed to consider evidence only in regard to the negligent operation of the water department prior to the time of the break.

There simply was not substantial evidence here for the jury to find negligence by the City in actually responding to the break. The court below therefore should have taken from the jury any consideration of negligence in regard to shutting off the flow of water. As we stated in Mang v. Eliasson, 153 Mont. 431, 458 P.2d 777:

"'To sustain a recovery, the evidence relied upon, whether

direct or indirect, must be substantial--more than
a mere scintilla (Citing cases) * * *'

"While the jurors are the sole judges of the facts,
the question of whether or not there is substantial
evidence in support of plaintiff's case is always a
question of law for the court."

Here, the evidence shows that the break filled the basement of the
Maverick Bar within a matter of minutes after the break occurred. The
damage thus occurred before it was reasonably possible for the City to
arrive and control the break. The damage was not proximately caused by
any alleged delay in arrival by city crews.

Furthermore, the evidence overwhelmingly shows reasonable care in
the manner of the City's response, once the water department was notified
of the break. This is particularly true in light of the extreme winter
conditions.

Wombold arrived on the scene within four minutes after hearing
the radio conversation between the police and Korin which identified the
break's location. Wombold arrived at the scene with a map of valve loca-
tions and tools for closing the valves (including a power key on the truck).
He received additional help from City personnel within ten to fifteen minutes.

Plaintiffs objected to the fact that Wombold and others did not
arrive with a steamer device in their trucks and could not close the valves
until one was brought from the City shops. Boettcher, however, testified
that this was the first time a steamer had ever been used on a water main
break of this type. He stated the water department rarely needed such equip-
ment and did not make a habit of carrying it on the trucks.

Such facts do not constitute substantial evidence of negligence in
the City's response to the break; this facet of the negligence issue should
not have gone to the jury.

On the other hand, a fact question is presented on the issue of
whether the City's operation of the water department was negligent insofar

- 15 -

as it relates to the proper replacement of failing mains. Credible evidence was presented from which the jury might determine the City's record system was insufficient to make use of its standard of replacing pipe when the annual cost of repair exceeds amortized annual cost of replacement. The jury might find that tests should have been conducted in 1957 and 1962, when this same main previously broke, to determine its condition. Perhaps the City should have been alerted to the need for replacement by the number of breaks in the area including this main.

The jury, of course, may have believed the City's evidence regarding these events. So, too, it was for the jury to determine the existence of any negligent installation of main, based on the conflicting testimony of plaintiffs' and defendant's experts on the type of pipe installed and the condition of the main at the time of the break.

It was thus not error for the court to deny defendant's motion for a directed verdict on the negligent operation aspect of the issue; it will be necessary though to conduct a new trial on this issue without the prejudicial influence of an improperly charged res ipsa loquitur instruction.

Finally, the defendant urges that the court below should have given the following instruction:

> "In this case the standard of care required by the defendant is the care which reasonably prudent operators of waterworks are accustomed to use under circumstances similar to those existing in this case.
>
> "Where such standard is not such matter of common knowledge, the burden rests upon the plaintiffs to introduce sufficient evidence from which a jury may reasonably determine the standard of care appropriate to the situation developed by the evidence."

Plaintiffs maintain that the proper instruction is the court's instruction No. 5, defining negligence as a want of ordinary care and skill in the circumstances, which reads:

> "Every person is responsible for injury to the person or property of another, caused by want of ordinary care or

- 16 -

skill, (subject to the defense of contributory negligence). When used in these instructions, negligence means want of such ordinary care or skill. Such want of ordinary care or skill exists when there is a failure to do that which a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such person under the existing circumstances would not have done."

Plaintiffs claim that the standard of care advanced by defendant, replacement when annual cost of repair exceeds annual cost of replacement, is negligent in itself. Plaintiffs do not cite specific authority in support of their position. Despite defendant's citation of authority in some jurisdictions which would require plaintiff to introduce substantial evidence from which a jury may reasonably infer the standard of care appropriate to the situation, we do not believe the plaintiffs should be so required.

Our review of the authorities on the applicable standard of care shows that municipalities constructing, maintaining and operating a water-works system are liable for negligence in the performance of such functions in the same manner as a private corporation or individual would be. 63 C.J.S. Municipal Corporations, Section 915.

The duty of care is such cases should simply be that of ordinary care, the reasonable man standard. See Central Park Plaza Corp. v. City of New York, 26 N.Y.S.2d 241. In Stein v. Louisville Water Co., 249 S.W.2d 750, the Kentucky Court of Appeals found error in the giving of that part of city's instruction which went beyond defining defendant's duty as that of ordinary care. In that case, plaintiff sought recovery for water damage resulting from two breaks in defendant's main. The court stated the instruction "should have merely submitted the issue of ordinary care on the part of the defendant to learn of the defective condition of the pipe and remedy it." In Ye Cocke and Kettle, Inc. v. Town of Seabrook, 224 A.2d 578, the Supreme Court of New Hampshire noted that defendant municipality's duty was to operate its water system in an ordinary, prudent manner. And in Yearsley v. City of Pocatello, 210 P.2d 795, the Idaho Supreme Court found that while the city

was not an insurer of its water system condition, it was bound to use "ordinary care and skill" in constructing and maintaining the system.

In none of these cases do we find plaintiff required to introduce sufficient evidence to define a particular standard of care appropriate to the individual fact situation. We agree that such would be an unconscionable burden and thus find no error in the refusal of defendant's proposed instruction.

In accordance with the foregoing, the judgment is reversed and the case is remanded for a new trial.

_____
                                    Chief Justice

We concur:

_____

_____

_____
Associate Justices