No. 24,048.

J. W. GARVEY, Attorney in fact, etc., *Appellant*, v. THE COLEMAN LAMP COMPANY, *Appellee*.

#### SYLLABUS BY THE COURT.

EVIDENCE—*Fire from Gasoline Lamp—Testimony Contrary to Physics and Common Knowledge—Res Ipsa Loquitur.* In an action to recoup loss paid according to policies of insurance on account of fire, the petition and proof were that the fire was set by explosion of a gasoline lamp. The petition charged the explosion was caused by a defect in the lamp, which was definitely described. The proof that the defect was the proximate cause of the explosion contradicted elementary principles of physics, and facts within the common knowledge and experience of people generally. *Held*, the doctrine of *res ipsa loquitur* did not apply, and a demurrer to the plaintiff's evidence was properly sustained.

Appeal from Sedgwick district court, division No. 1; THOMAS E. ELCOCK, judge. Opinion filed March 10, 1923. Affirmed.

*W. M. Glenn*, of Tribune, *J. Graham Campbell*, and *Ray Campbell*, both of Wichita, for the appellant.

*R. L. Holmes, C. G. Yankey, W. E. Holmes, D. W. Eaton*, and *John L. Gleason*, all of Wichita, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to recoup loss paid according to policies of insurance on account of fire, which it was alleged was caused by explosion of a lamp manufactured and sold by the de-

Garvey v. Lamp Co.

fendant.  A demurrer to the plaintiff's evidence was sustained, and he appeals.

The destroyed property belonged to the Foster Lumber Company, whose manager purchased the lamp.  The lamp was received on October 2.  The manager, Watson, unpacked it and assembled the parts in strict conformity with the manufacturer's instructions.  The principle of the lamp is that gasoline is forced upward from the bowl by air pressure to a generator, and from thence gas rises to the mantels suspended eight or ten inches above the top of the bowl. Gasoline is admitted to the bowl through an opening which, after the bowl is sufficiently filled, is closed by a plug screwed into the opening by application of a wrench to a hexagonal nut forming the top of the plug.  In this plug is a small perforation through which air is forced into the bowl by use of a pump similar to a bicycle pump. The aperture is controlled by an air valve turned by a thumbscrew. Watson filled the bowl with gasoline, and screwed in the plug with a pair of pliers.  He then pumped air into the bowl according to directions, and closed the orifice with the thumbscrew.  He then lighted the lamp, and it burned properly.

The lamp was used each night, and burned properly until the night of October 6.  About dark of that day Watson lighted the lamp and put it on the counter of his office.  Later in the evening he left the office, and on returning found the lamp burning dimly.  His testimony regarding what then occurred is abstracted as follows:

"He went to the counter on which the lamp sat and picked up the air pump, with the intention of pumping more air into the lamp.  He turned the thumbscrew in the bowl of the lamp, controlling the air valve, a turn or two, according to directions, with the intention of applying the air pump, and almost instantly a flash of light or flame appeared around the lamp, said flash or flame extending from the lighted mantels down to and around the bowl. Witness then ducked under the counter, and almost instantly there was an explosion, and flame or fire was thrown all over the office room.  The explosion was not as loud as a shotgun report, but was quite a sharp report. . . .

"When witness started to pump air into the lamp on the night in question, he did not loosen the filler plug which had to be removed to put in gasoline, same having been screwed tight by him with a pair of pliers when he first filled the lamp, but only turned with his fingers the thumbscrew controlling the air valve, no other valve or screw being touched.  Witness put gasoline and air in the lamp but once, immediately after putting it together upon its arrival, and had done nothing with the lamp from that first time except to light it on the intervening nights, until the night in question."

A witness, Shepard, who assisted Watson in assembling the parts of the lamp, testified the threaded joints went together perfectly, there were no defects in the threads, and none of the connections leaked. His testimony as abstracted continued as follows:

"As soon as the lamp was assembled, Watson lit it, and there were no leaks, as they looked it over. On the night of October 6, he met Watson at the barber shop, and went with him to the lumber yard to discuss the purchase of some lumber for a cook shack, arriving there about ten-thirty that night. When they entered the office, the Coleman gasoline lamp was on the counter, burning dimly, and Watson went back of the counter and picked up the pump and loosened the air valve, and the lamp exploded at that time, and covered witness with a flame of fire. . . . When the lamp exploded it made a noise something like powder flashing. There was a little flash, and witness was saturated with a flame of fire. . . . The lamp exploded with a little report just like a puff of loose gunpowder. There was quite a report, and a big flash like gunpowder. Witness saw Mr. Watson pick up the pump and take hold of the lamp, and the explosion then occurred."

The petition charged that the fire which occasioned the loss was caused by explosion of the lamp, and contained the following allegation:

"The specific act of negligence of the defendant, that was the direct and proximate cause of the explosion heretofore mentioned, was in so constructing the said gasoline lamp as to permit the escape of gaseous vapors from the bowl of gasoline, directly beneath the lighted mantels, through the air valve when the air-valve thumbscrew was turned for the purpose of pumping air into the bowl, as directed by the instructions of the defendant in its literature."

The only explanation of the explosion was given by an expert, whose testimony is abstracted as follows:

"The only way an explosion of a lamp such as the exhibit might occur would be by fire penetrating the bowl where it would ignite the mixture of gasoline fumes and air, and if there was but a small outlet, an explosion would then occur. . . . In the opinion of the witness, the explosion of the lamp under conditions such as existed at the time in question could only have occurred through the escape of air impregnated with gasoline fumes through the air valve, same becoming ignited from the lighted mantels, and hence running downward through the air valve to the bowl of the lamp. The fumes on top of the gasoline in the bowl of the lamp thus becoming ignited, and the opening to the outside air being small, the lamp would then explode. In the opinion of the witness, the explosion in question must have occurred because of a leaky or defective air valve which allowed fumes from the gasoline bowl to rise to the lighted mantels, and they becoming ignited, the fire then followed the vapor downward into the bowl of the lamp."

Watson did not testify that the metal bowl of the lamp, or the thumbscrew, or the filler plug, was warm when he prepared to apply the air pump. The testimony was, the explosion occurred almost instantly following the turning of the thumbscrew, and so excluded the possibility of the bowl of the lamp becoming so heated from the outside that expansion of the contents ruptured the bowl. This being true, the testimony of the expert witness, that the only way the lamp could be made to explode would be by induction of flame into the inside of the bowl, was, under the circumstances, correct.

The hole in the filler plug through which air was injected into the bowl was small, and at the time of the accident the pressure within the bowl, which forced gasoline vapor upward through the air hole, kept the mantels burning. It was not possible for flame to be sucked into the bowl through the air hole while gaseous vapor was pouring out through it. Flame would no more run back into the bowl through this small hole than it would run back into the bowl through the pipes which supplied the mantels, and the testimony of the expert as to the cause of the explosion contradicts, not only elementary principles of physics, but facts within the common knowledge and experience of people generally. Even a jury may take cognizance of such facts. (*Rickel v. Railway Co.,* 104 Kan. 453, 458, 179 Pac. 550.)

In his brief the plaintiff says nobody knows what occurred, but there was an explosion, and the doctrine of *res ipsa loquitur* should have been applied. The plaintiff took *res ipsa loquitur* out of the case by his pleading and proof. He claimed to know the fire was set by an explosion of the lamp, and the explosion was caused by a defect in the lamp which was definitely described. This being true, he could not employ the doctrine of *res ipsa loquitur* to make a *prima facie* case. (*Byland v. Powder Co.,* 93 Kan. 288, 144 Pac. 251.)

Since the pleaded defect in the lamp was not the proximate cause of the explosion, if the lamp exploded, the demurrer to the plaintiff's evidence was properly sustained.

The judgment of the district court is affirmed.