81 N.J. Super. 481 (1963)
196 A.2d 18
MARION J. FANNING, PLAINTIFF-RESPONDENT,
v.
TOWN OF MONTCLAIR, A MUNICIPAL CORPORATION IN THE COUNTY OF ESSEX AND STATE OF NEW JERSEY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 12, 1963.
Decided December 18, 1963.
*482 Before Judges CONFORD, FREUND and SULLIVAN.
Mr. Robert J.C. McCoid argued the cause for appellant (Messrs. Schneider, Lustbader & Morgan, attorneys).
Mr. Francis F. Welsh argued the cause for respondent.
The opinion of the court was delivered by SULLIVAN, J.A.D.
Defendant municipality appeals from a judgment of $1,000 in favor of plaintiff as well as from the refusal of the trial court to grant defendant's motions for an involuntary dismissal.
The suit arises out of a break in a municipal water main with resultant water damage to plaintiff's property. On June 11, 1960 plaintiff was the owner of premises 85 Upper Mountain Avenue, Montclair. About midnight on that date a break occurred in an underground water main in front of plaintiff's property. Plaintiff telephoned the Water Bureau and reported the incident and a repair crew was dispatched to the scene. The crew arrived about 12:45 A.M., shut off the water in the main, located the break in the pipe and repaired it. However, prior to the shutting off of the main, the escaping water flowed over plaintiff's property in considerable volume and flooded the basement apartment in her house. It is undisputed that plaintiff suffered some damage.
The instant suit charges defendant with negligence in failing to make periodic examinations and tests of its water mains in order to determine their condition and their ability to resist *483 water pressure, and in increasing the water pressure without determining the ability of the mains to withstand the increased pressure.
At trial plaintiff testified to the events of the night in question and the resultant damage to her real and personal property. Plaintiff's other witness was Arnold S. Giannetti, the Superintendent of the Montclair Water Bureau. His testimony may be summarized as follows: Such records as were available in the Bureau indicated that the water main under Upper Mountain Avenue was laid about 1890. It was a 12-inch unlined cast iron pipe. The water runs through the main by gravity from a storage tank in the Watchung Mountains. The water pressure in the main in question at the time of the break was about 100 pounds. No examinations or tests of the pipes along Upper Mountain Avenue had been made in recent years. In December 1959 there had been a break in a water main within a mile of plaintiff's property.
On cross-examination the witness testified that the Bureau ran periodic tests and inspections of fire hydrants and gate valves. He said that the system is manned on a 24-hour basis and has controls and gauges showing water pressure and amount of water in the tank and an alarm system which will respond to any major break.
After plaintiff rested her case defendant moved for a judgment of involuntary dismissal which was denied.
Defendant recalled the Superintendent of the Water Bureau as its witness and showed that he is a licensed professional engineer with a degree in engineering from "Pennsylvania Polytechnic Institute, Renssalaer" (sic). He is also certified by the New Jersey State Board of Health "to operate a water system." He testified that originally the water supply was stored in a smaller storage tank but that in 1929 a larger tank with a greater storage capacity was installed and was still in use in 1960. He intimated that the change-over to the larger tank in 1929 caused an increase in water pressure from about 96 or 97 pounds to the present pressure of about 100 pounds.
*484 The Superintendent was at the scene with the repair crew and described how the main was found about four feet underground. He estimated that the break was repaired and water restored in the main about 6 or 7 A.M. He also testified from the Bureau's graph records for the night in question which showed a rise in the water level of the storage tank up to midnight and shortly thereafter a rapid decline in the water level until about 12:45 A.M., when the decline stopped.
The Superintendent stated that the life of cast iron pipe was indefinite and that such pipe is in service in places in the United States over a hundred years, and much longer in European countries. He testified that at the present time pipe is inspected at the foundry, and also at the time of installation by means of steam pressure, but that once pipe is buried in the ground and goes into service there is no method whereby the pipe can be reasonably inspected and that he "never heard of any water company going after and testing pipe once it is installed and inspected."
On cross-examination he disclosed that he had been employed by defendant in its Water Bureau since 1936. He estimated that since then the system had experienced about 15 breaks. He did not know whether the main in question had actually been tested when installed in 1890. Nor did he know what pressure the main had been built to withstand.
At the conclusion of the defendant's presentation of evidence, plaintiff moved to amend the pretrial order to include an additional charge of negligence based upon the length of time it took the Bureau to get the repair crew to the scene. The trial court denied the motion. Defendant then renewed its motion for an involuntary dismissal, decision on which was reserved, and the matter was submitted to the jury for its determination.
The trial court refused plaintiff's request to charge the jury that the doctrine of res ipsa loquitur applied to the break in the main. However, the court did instruct the jury that defendant, in the operation of its water supply system was exercising a proprietary and not a governmental function so *485 that its liability, if any, was to be determined "under ordinary principles of negligence." The court also instructed the jury that:
"When a municipality constructs and operates a water system it becomes its duty to keep it in repair and free from conditions which will cause damage to private property. Its duty to keep its water system in repair is not performed by waiting to be notified by citizens that they are out of repair, and repairing them only when the attention of the municipal officials is called to the damage they have occasioned by having become dilapidated and defective. Its duty involves the exercise of a reasonable degree of watchfulness in ascertaining their condition from time to time, and preventing them from becoming dilapidated and defective. Where dilapidation and defects are the ordinary result of the use of the water system which ought to be anticipated and could be guarded against by an occasional examination by tests or otherwise, the failure to make such examinations is neglect of duty which renders the municipality liable for damage proximately caused thereby."
Defendant objected to the part of the court's charge quoted above on the ground that there was no testimony in the case to warrant such a charge. As heretofore noted, the jury returned a verdict in favor of plaintiff for $1,000. Thereafter the trial court refused to disturb the jury verdict on motion.
On this appeal defendant does not dispute that its liability is to be measured by principles of ordinary negligence. Rather it contends that the evidence did not establish any negligence on its part.
We conclude that defendant's motion for an involuntary dismissal should have been granted since there was no evidence to support the charge of negligence against defendant.
The record does not disclose what caused the break in the main. The Superintendent who was present when the repairs were made testified that the break was on the top of the pipe, resembled the bow of a ship and was about three feet in length. However, we do not know what was the cause, or even probable cause of the break.
Plaintiff suggests that it might have been a defect in the main when originally installed, or deterioration of the *486 main over the years to a point where it could no longer contain the water pressure, or a result of the increase in pressure in 1929. Yet, it also might have been from a cause unrelated to plaintiff's hypotheses such as a settlement or fall of the earth itself. It has been held in this State that the doctrine of res ipsa loquitur is not applicable to the breaking of an underground water pipe. Stein v. City of Newark, 52 A.2d 66, 25 N.J. Misc. 170, 174 (Cir. Ct. 1947). As heretofore noted, in the instant case, the trial court refused to charge the doctrine of res ipsa loquitur. This seems to be the general rule in this country. 56 Am. Jur., Waterworks § 38, pp. 945-946. However, see George Foltis, Inc., v. City of New York, 287 N.Y. 108, 38 N.E.2d 455 (Ct. App. 1941). In any event, proof of the break in the main, without more, does not entitle plaintiff to an inference that the break was the result of some negligence on defendant's part. Stein v. City of Newark, supra.
Plaintiff also argues that defendant is chargeable with negligence in failing to make periodic examinations and tests of its water mains. This theory of negligence was submitted to the jury by the trial court in the portion of the charge heretofore set forth.
Our difficulty with this part of the charge is the lack of any evidence to justify such a charge. Defendant's alleged failure to examine or test its water mains must be related to some standard of care and feasibility. There is no evidence in this case that proper maintenance of a water system called for examinations and tests beyond those performed by defendant. Plaintiff did not produce any expert testimony to show what other kinds of examinations or tests of the water mains could and should have been made. How can a main which is four feet underground and furnishing water to homes and fire hydrants on a 24-hour basis be tested other than in the manner testified to by defendant's expert? Plaintiff's proof does not furnish any answer. General statements as to defendant's duty to maintain its water system, and its duty to make periodic examinations and tests thereof, are not *487 meaningful without a specification of some generally accepted standard to which defendant should be held.
Here, the only expert testimony was that pipes are inspected at the foundry and then steam-pressure tested after installation and prior to actual operation. The expert "never heard of any water company going after and testing pipe once it is installed and inspected." It is not reasonable that a water utility should be required to dig down to inspect periodically miles of underground piping. Nor are there any facts to indicate an inspection should have been made at the precise point at which this water main break occurred.
The weight of authority in this country is to the same effect. In A. Da Prato Company v. City of Boston, 334 Mass. 186, 134 N.E.2d 438 (Sup. Jud. Ct. 1956), plaintiff sued for damages resulting from the bursting of an underground cast iron water pipe which had been laid in 1892. The trial court directed a verdict for the defendant and the Supreme Judicial Court affirmed, using this language:
"* * * There was no evidence here that the pipe in question was not properly laid or that it was of a kind which after the length of time it had been in the street could not safely be used. It may be considered settled that reasonable care on the part of the city did not require the periodical digging up of the street for purposes of inspection. [Citing cases]." (134 N.E.2d, at p. 439)
In Grace & Co. v. City of Los Angeles, 278 F.2d 771 (9 Cir. 1960), also a suit for damages resulting from a break in a cast iron water pipe, the Ninth Circuit affirmed a judgment in favor of defendant, stating:
"No expert testified that it was the practice in any municipality to dig up underground pipe to ascertain its condition, no matter when it was installed. To the contrary, there was testimony that if any policy had been adopted in other municipalities in California, it was, as in Los Angeles, that after installation of the cast iron water pipe it was used without inspection or replacement until there were sufficient breaks to indicate the pipe had corroded or become undependable." (278 F.2d, at p. 774)
Finally, plaintiff contends that 15 breaks in defendant's water supply system since 1936 was notice to defendant *488 that its mains were deteriorating, so that defendant's omission to test or examine the condition of its mains was negligence. Again the evidence of breaks is not related to any standard. In any water supply system some breakage and repair is normal and to be expected. We do not know whether in a water supply system the size of the one here involved, the occurrence of 15 breaks since 1936 would indicate deterioration of the mains or would be considered normal maintenance and repair of the system. No evidence was presented to support plaintiff's contention in this regard.
Plaintiff urges that defendant's liability can be upheld on the rationale of Clay v. Jersey City, 74 N.J. Super. 490 (Ch. Div. 1962). In that case a property owner was allowed recovery against a municipality for property damage resulting from a defective underground sewer main, the court holding that the failure on the part of the municipality to inspect for defects, or to maintain or repair the pipe until defects became self-apparent was a breach of duty. In Clay, however, the trial court, at the request of counsel, inspected the area involved and observed sewage flowing through a break in the pipe at a point where the main was exposed above the ground. The court also found that not only had plaintiff notified the municipality of the condition in 1957, but that the city had notice of defects in the sewer line long before 1957. It was against this background of notice that the court determined that the failure of the municipality to inspect for leakage or defects over the years, or to maintain or repair the same until defects became self-apparent was a breach of duty. In the instant case the element of actual or constructive notice is not present.
On the basis of the foregoing, we conclude that there was no issue to submit to a jury since there was no evidence that defendant's maintenance of its water mains fell short of generally accepted standards of care.
The judgment herein in favor of plaintiff is reversed with directions to enter judgment in favor of defendant. No costs.