(615 P.2d 814)

No. 80-50422-A

JOHN T. ARNOLD ASSOCIATES, INC., for and on Behalf of SUTTON PLACE, LTD., A Limited Partnership, and V. N. HARRIS and JOHN T. ARNOLD, d/b/a VIC'S PLACE, A Partnership, and DR. RUSSELL DUCKWORTH, D.D.S., *Appellants,* v. THE CITY OF WICHITA, KANSAS, A Municipal Corporation, *Appellee.*

Petition for review denied January 23, 1981.

Opinion filed August 22, 1980.

*Thomas D. Kitch,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, for the appellants Sutton Place, Ltd., and Vic's Place.

*Christopher Standlee* and *Eugene G. Coombs,* of Coombs, Chartered, of Wichita, for the appellant Russell Duckworth, D.D.S.

*Lee H. Woodard* and *James Z. Hernandez,* of Woodard, Blaylock, Hernandez, Pilgreen & Roth, of Wichita, and McDonald, Tinker, Skaer, Quinn & Herrington, of Wichita, for the appellee.

Before FOTH, C.J., SPENCER and SWINEHART, JJ.

SWINEHART, J.: This is an appeal from a jury verdict in favor of the defendant City of Wichita, returned in an action for damages sustained as a result of a broken water main. The plaintiffs contend the trial court erred (1) by refusing to instruct the jury on the doctrine of res ipsa loquitur, (2) by refusing to instruct the jury on the theory of strict liability, and (3) by refusing to grant the plaintiffs a new trial on the basis of juror misconduct.

On June 23, 1974, district fire chief James Schauner and his driver James L. Fiant were proceeding north on Market Street shortly before 8:30 a.m. when they noticed water running in the gutter in front of Sutton Place, an office building located on the southeast corner of Market and William Streets in downtown

Wichita. Upon inspection they discovered that water was coming up quite fast through the street, escaping through expansion joints between the curbing and the street, flooding William Street, and crossing over the curbing onto the sidewalk. Fiant crossed the street to check the basement of Macy's Department Store while Schauner went to check the basement of Sutton Place. After contacting the maintenance men at Macy's, Fiant headed towards Sutton Place, noticed that the street surface had been lifting as a result of the water, and realized that a broken water main must be the cause. At approximately 8:38 a.m., Schauner ordered the fire dispatcher to advise the police and water departments of the broken water main.

Since the extent of the damages to the building as well as loss of income to the tenants are not relevant to this appeal, they will not be described. However, the total amount of damages sought by the plaintiffs was approximately $125,000.

At approximately 8:46 a.m., on June 23, Harold Dannenfelser, a maintenance man on duty for the water department, telephoned John Walsh, an employee of the water department, to inform him of a broken main in the vicinity of William and Market Streets. Earlier Dannenfelser had been advised by the fire dispatcher of a broken main. Additionally, Harry Tillma, another water department employee, had advised Dannenfelser that pressure charts located in the pump station recorded a sudden drop in pressure at approximately 8:38 a.m. Although the drop in pressure indicated the possibility of a main break, it was impossible to determine exactly where the break had occurred. There were indications, however, that the break was in the downtown area. Walsh ordered Dannenfelser to call a crew and to barricade the street.

After receiving the call, Walsh immediately left for the scene and arrived at approximately 9:10 a.m. He realized that the water was coming from the twelve-inch main beneath William Street and began to look for the valve on the east side of Market Street to shut off the water. He located the valve by using a map of the water distribution system. At first Walsh had to look through the water in an effort to find the valve cover, but the cover soon became visible as the water quickly disappeared from the street. The valve was shut down by about 9:25 or 9:30 a.m. Merely closing this valve did not stop the flow of water into the basement of Sutton Place because the water mains in the Wichita distribu-

tion system are interconnected. Therefore, Dannenfelser and Walsh proceeded to shut down the valve at Broadway, as well as two other valves on the north and south side of William Street at Broadway which controlled the flow of water from another main into the twelve-inch main beneath that intersection. This procedure took approximately forty-five minutes. Accordingly, the flow of water into Sutton Place was terminated around 10:15 a.m.

The twelve-inch main which ruptured causing the water damage to Sutton Place was laid in 1928. At the time of its installation, cast iron pipe, with a life expectancy of about one hundred years, was considered the "Cadillac" of water pipes, and was the standard of the industry. An expert for the defendant testified that 95% of the pipe used in water distribution systems throughout the country is cast iron.

In 1958 John Walsh began keeping records of breaks in the city water mains in order to have some idea of where there might be problems with the pipes. He was personally familiar with all breaks that occurred in the twelve-inch cast iron main beneath William Street between 1947 and 1974, but had no knowledge of any breaks prior to that time. The following is a brief summary of those breaks.

On April 21, 1952, a break occurred approximately two blocks east of the break in front of Sutton Place. A three-to-four-foot split occurred and a twelve-foot section of the pipe was replaced. On May 22, 1958, a main broke approximately one block west of the break in question and a twelve-foot section of the main was replaced. Seventeen feet of pipe were replaced as a result of a break on May 18, 1967. The east end of the replacement pipe was approximately sixty-five feet west of the location of the break in front of Sutton Place. Another break located approximately one block west of the break in front of Sutton Place occurred on August 3, 1970, resulting in replacement of a twelve-foot section of the main. Thirteen feet of pipe were replaced after a main broke on October 31, 1973, again approximately one block west of the break which occurred in front of Sutton Place. The break which damaged the plaintiffs' property resulted in a split in the bottom of the pipe approximately five feet in length.

The condition of the twelve-inch main at the site of the break which occurred in April of 1952 was not noted in the repair order. Inspection of the remaining breaks, except for the one in ques-

tion, revealed that *at the break points* the pipe was in rather poor condition. However, on June 27, 1966, a four-inch water line running from the water main in question to Sutton Place was installed. Bruce Cluck, a water department employee who helped install the line, testified that the line was connected into the twelve-inch main in the proximate area of the June 23, 1974, break. At that time the condition of the main in the area of the connection was satisfactory.

When repairs necessitated by the breaks outlined above or ones similar to them are made, the water department uncovers the section of pipe which is broken. The two exposed ends of the main are examined to determine the condition of the pipe. Additional pipe is exposed until satisfactory pipe is located, at which point a new section of pipe is installed using mechanical joint sleeves to hold it in place. As a general rule this is the only time that the mains are inspected, unless a street is being reconstructed, *i.e.*, all materials are removed from curb to curb to put in a new street. During reconstruction, the water department is able to gain ready access to the main. Such access is not possible when streets are merely resurfaced, *i.e.*, stripping an old layer of asphalt and replacing it with another. The City so limited its inspection due to the prohibitive costs of tearing up the streets and the traffic problems which would result.

Walsh was responsible for identifying those portions of the mains in need of replacement. Among the criteria he used to determine whether to recommend replacement were (1) the number of breaks in a main, (2) the cause of the breaks, and (3) the condition of the pipe in the vicinity of the breaks. He had never recommended that any portion of the main beneath William Street be replaced. He further testified that since he had never recommended that the main be replaced, he must have believed the pipe was in good enough condition to remain in service. He stated that the water department had not adopted any standards based upon the number of breaks or their proximity to each other to determine when replacement of a given length of a twelve-inch cast iron main was justified. However, as most of the mains in the downtown area were laid prior to 1930 or 1940, they would be replaced when the streets were reconstructed.

John Wynkoop, director of the Wichita Water and Water Pollution Control, testified that he would not have replaced any of

the main in the two-block section of William near the June 23, 1974, break until the street was reconstructed. He stated the expense of removing and replacing a portion of the street over the main was too great and the inconvenience of closing the street to the public too severe to justify such replacement.

The water department maintains a record of the frequency with which each size and type of main in the system breaks on an annual basis. During the period of 1958 to 1973, an average of 200,000 feet of twelve-inch cast iron main was in use in the Wichita water system. During this time twenty-five breaks occurred in all of the twelve-inch cast iron mains in the entire system.

There is no real dispute about the cause of the break in question. John Walsh testified that it and all of the breaks in the twelve-inch main outlined above except the one which occurred on April 21, 1952, were caused by a process known as graphitic corrosion. Although the pipe remains intact during this process, it becomes weaker and the exterior of the pipe turns to graphite and becomes soft. The extent of the corrosion may be measured by scraping the surface of the pipe with a knife or other sharp instrument. Graphitic corrosion is the result of an electric current created when moisture combines with natural salts (chlorides and sulfates) in the soil. As the electric current passes through the pipe, iron ions are displaced and replaced by graphite. Graphitic or soil corrosion is caused by soil conditions present in the area adjacent to the break. A corrosive environment exists wherever the combination of natural salts and moisture come in contact with cast iron pipe.

When the twelve-inch main in question was laid in 1928, no protection was afforded against corrosion. In recent years sand has been used to encase the iron pipe. Alternatively, pipes might be encased with a plastic sleeve to prevent corrosion. The water department also began using asbestos cement pipe, which is cheaper and resists corrosion, in constructing and replacing large mains approximately ten years prior to the break in front of Sutton Place. Plaintiffs introduced evidence that sacrificial anodes were being installed to protect older and smaller cast iron mains against corrosion. However, sacrificial anodes cannot be used on the twelve-inch or larger mains because of the size of the pipe. Whenever a break in the twelve-inch main occurs and

corrosion is detected, the soil causing it is washed away and replaced with sand. However, Wynkoop had no specific knowledge of those areas within the city where the soil contained sulfates or chlorides. He stated that soil conditions vary considerably from place to place. Where breaks occurred as a result of the corrosive environment, he admitted that possibility for additional breaks in those areas would likely be higher than in areas without such soil conditions.

Plaintiffs contend that the break in front of Sutton Place resulted from several policies of the City's water department. They claim that the twelve-inch main not only is designed to provide water service to residences or buildings on the line, but also provides capacity for fire fighting purposes. They believe this latter feature of the design carries a greater risk for property damage whenever a main breaks because the pipe is forced to carry a greater volume of water than it otherwise would. Whenever a major fire occurs, the water department pumping station is notified so that additional pumps may be brought on line if the pressure in the mains in the area of the fire drops too low. At about 4:00 p.m. on June 22, 1974, a major fire occurred five blocks east of Sutton Place. However, the plaintiffs were unable to present any specific evidence that additional pumps had been added to the system during the fire fighting operation. Nevertheless, they contend this practice increases stress on the system as a whole.

As the water mains are interconnected to permit isolation of a break area without disturbing service to other customers on the main, the shut-down time of the flow of the water into the break area is increased. In this case four valves had to be closed before the flow of the water could be stopped. Such a system increases the likelihood of damage according to the plaintiffs. The plaintiffs also complain about the policy of the water department to add additional pumps if a broken main threatens the supply of water to other customers in the system, even though this means that more water might escape from the break area. After the break occurred on June 23, 1974, the pump station operator did add a pump to maintain pressure in the east side of town. Plaintiffs also take issue with the policy of the water department which limits the inspection and replacement of large cast iron mains in the downtown area to the times when breaks occur or when the street

over the main is reconstructed. The water department does not maintain a separate line item in its budget for replacement of old mains and new construction. Plaintiffs contend this failure slights replacement in favor of new construction. They also maintain the water department fails to periodically review break records and determine break frequency of a particular main in order to determine whether replacement is made or should be made. And finally, they assert that the water department fails to give appropriate consideration to the possibility of damage to private property when deciding whether or not to replace a main.

At the close of the evidence, the trial court determined that the doctrines of strict liability and res ipsa loquitur were inapplicable to the case and refused to instruct the jury under either of the doctrines. On June 16, 1978, the jury returned a verdict in favor of the defendant. A journal entry was filed on August 25, 1978, and the plaintiffs' motion for new trial was denied on August 25, 1978. The plaintiffs had moved for a new trial on the ground of juror misconduct.

The plaintiffs first contend that the trial court erred by refusing to instruct the jury under the theory of res ipsa loquitur as they had requested. To determine the persuasiveness of this argument, we must first briefly review the general principles of the res ipsa loquitur doctrine.

Res ipsa loquitur is one type of circumstantial evidence and is not a matter of substantive law. *Bias v. Montgomery Elevator Co.,* 216 Kan. 341, 532 P.2d 1053 (1975); *Hugo v. Manning,* 201 Kan. 391, 441 P.2d 145 (1968); *Trent v. Sellers,* 1 Kan. App. 2d 267, 271, 563 P.2d 1106, *rev. denied* 225 Kan. 846 (1977). While the utility of res ipsa loquitur has been questioned, see, *e.g.,* Westerbeke, *Survey of Kansas Law: Torts,* 27 Kan. L. Rev. 321 (1979), the Kansas courts have adhered to its application. Although there are three traditional requirements which must be met before the doctrine may be invoked, there appear to be five relevant considerations which must be analyzed under the facts of this particular case to determine whether the trial court properly refused to give a res ipsa loquitur instruction.

There is a threshold requirement that a foundation fact be established by direct evidence. In essence, this means that the proximate cause of the injury must be established on the basis of facts presented to the jury and the jury may not infer this foun-

dation fact. *Chandler v. Anchor Serum Co.*, 198 Kan. 571, 426 P.2d 82 (1967). (This requirement has also been discussed as a subpart of the traditional requirement that the thing or instrumentality was within the exclusive control of the defendant.) *Arterburn v. St. Joseph Hospital & Rehabilitation Center*, 220 Kan. 57, 65, 551 P.2d 886 (1976), quotes approvingly from *Travelers Ins. Co. v. Hulme*, 168 Kan. 483, 486, 213 P.2d 645 (1950):

> " '. . . The doctrine has no application to proximate cause—or perhaps we should say no application to the initial fact, or the fundamental or foundation fact which caused the injury or damage. The doctrine will permit an inference or presumption that the known act—or foundation fact—which produced the injury (proximate cause) was a negligent act, but it will not permit such an inference or presumption as to just what foundation fact did produce the injury—or in other words, as to what act was the initial cause of the damage. Thus the doctrine cannot be applied where the thing which actually caused the injury or damage is unknown; but when it is known and disclosed and relied upon as the basis of the damage or injury, the application of the doctrine of *res ipsa loquitur* will infer negligence in the doing of the *thing* or in the commission of the *act*. . . .' "

In *Arterburn,* the plaintiff failed to demonstrate that the malfunction of a hospital bed was the thing (*i.e.,* the foundation fact) which caused his spleen to rupture, as several other reasonable causes had not been sufficiently eliminated. Accord, *Querry v. Montgomery Ward & Co., Inc.,* 217 Kan. 104, 535 P.2d 928 (1975).

In this action the damages suffered by the plaintiffs resulted from water surging into Sutton Place. The undisputed cause, that is, the foundation fact, of these injuries was the break of the water main. Having cleared this hurdle, plaintiffs were in a position to attempt to prove the three elements required in all res ipsa loquitur cases:

> "(1) It must be shown that the thing or instrumentality causing the injury and damage was within the exclusive control of the defendant; (2) the occurrence must be of such kind or nature as does not occur in the absence of someone's negligence; and (3) the occurrence must not have been due to contributory negligence of the plaintiff." *Bias v. Montgomery Elevator Co.,* 216 Kan. 341, Syl. ¶ 1.

The plaintiff need not eliminate all other possible causes of the occurrence to satisfy the exclusive control requirement. He need only present evidence sufficient to enable a reasonable person to conclude that on the whole the defendant was more likely negligent than not. *Bias v. Montgomery Elevator Co.,* 216 Kan. 341. As no other entity maintains control over the system, the plaintiffs have satisfied this first requirement.

There is a split of authority as to whether breaks in buried water mains occur in the absence of negligence. See, *e.g., City of Houston v. Church,* 554 S.W.2d 242 (Tex. Civ. App. 1977), and *Roberts Realty Corp. v. City of Great Falls,* 160 Mont. 144, 500 P.2d 956 (1972), discussed below. Here the trial court had to defer to expert opinion as the answer to this question is not a matter of common knowledge. The cause of the break (electrolysis) was known and it is arguable that the break could occur without negligence. The requirement that the plaintiffs not be contributorily negligent must be modified today to incorporate the relevant comparative negligence principles. In any event, defendants do not interpose such a defense.

Finally, even if all of the above requirements have been established, res ipsa loquitur will not apply if the plaintiffs produce evidence of an intervening cause or demonstrate the specific acts of negligence to such an extent that all of the facts and circumstances are shown by the evidence and clearly establish the precise cause of the injury to plaintiffs. *Hugo v. Manning,* 201 Kan. at 395. In *Hugo v. Manning,* the court explicitly rejected a rule that proof of facts sufficient to make a prima facie case will remove the doctrine, as well as one allowing its use absent proof dispelling the inference of negligence or establishing negligence as a matter of law. Accord, *Ballhorst v. Hahner-Foreman-Cale, Inc.,* 207 Kan. 89, 484 P.2d 38 (1971); *Garvey v. Lamp Co.,* 113 Kan. 70, 213 Pac. 823 (1923).

This last facet of the doctrine is the most crucial to this case. As extensively discussed in the facts, the precise cause of the break, the break frequency record of the surrounding main, the City's operation, inspection and replacement policies were explained in some detail.

The case law from other jurisdictions is generally consistent with the authority found in Kansas cases. Two thorough annotations discuss the application of the res ipsa loquitur doctrine to water main cases. See Annot., 91 A.L.R.3d 186, and Annot., 20 A.L.R.3d 1294, and cases cited therein. See also 78 Am. Jur. 2d, Waterworks and Water Companies § 62 *et seq.*

The plaintiffs have relied upon such cases to support their contention that a res ipsa loquitur instruction should have been given. The plaintiffs summarize:

"Based upon the evidence presented by plaintiffs, it is only fair to shift the

burden of proof to the defendant, thereby requiring it to establish that it was without fault in connection with the operation and maintenance of the main. In this context, the issue is whether the defendant waited too long to replace the main—not whether it should be required to inspect water mains by uncovering them, as suggested by the trial court."

Implicit in the above statement is an allegation that the City had notice that the main was in such poor condition that it should have been replaced. That is, there were a sufficient number of breaks in the area to reasonably expect the City to make repairs which would have prevented the break which caused damage to the plaintiffs' property.

Both parties have relied upon cases discussed in the annotations cited above. In general, most jurisdictions agree that res ipsa loquitur is available in broken water main cases if the requirements of the doctrine are otherwise satisfied. Annot., 20 A.L.R.3d 1294, §§ 2 and 4. One of the major difficulties in this regard concerns buried mains. Disagreement in these instances exists as to whether the break is likely to happen without someone's negligence. Inspection problems cause other concerns, *i.e.*, how can an operator or distributor know where a break is likely to occur. An examination of relevant cases indicates that whether res ipsa loquitur is available turns upon the facts of each case.

In *Fanning v. Montclair*, 81 N.J. Super. 481, 196 A.2d 18 (1963), res ipsa loquitur was not applicable because the record did not disclose the cause or even probable cause of the break in the main. Simple proof of a break in the main did not entitle the plaintiff in *Fanning* to an inference that the break was due to the negligence of the defendant. Of course, *Fanning* is distinguishable from the case before this court as the cause of the break, that is, the corrosive action of the soil, was known.

*Roberts Realty Corp. v. City of Great Falls*, 160 Mont. 144, found that the trial court erred by giving a res ipsa loquitur instruction. The doctrine was not available to plaintiffs' theory that the defendant negligently responded to the break and did not repair it as quickly as possible because all the facts regarding the repairs were equally accessible to both the plaintiffs and the defendant. The court also rejected the contention that the theory applied to the defendant's failure to replace the main before the break occurred because the plaintiffs failed to demonstrate that the break was one that did not ordinarily occur, absent someone's negligence. Indeed, the court observed that the record was replete

with evidence that breaks in water mains could occur without negligence. For example, the life expectancy of cast iron water pipes varied depending upon the corrosiveness of the soil and the location of corrosion damage was almost impossible to determine. Pipes could also be damaged by temperature variations or the impact from street traffic above it. In reaching its conclusion, the court relied upon *Fanning v. Montclair,* 81 N.J. Super. 481.

In *City of Houston v. Church,* 554 S.W.2d 242, the trial court instructed on res ipsa loquitur in a case where a broken water main flooded a warehouse. On appeal the court found that the evidence indicated that it was not the kind of accident that would not have occurred without negligence. There testimony established that the break could have resulted from electrolysis or ground shifts, which are acts of nature and unpredictable.

A different reason for refusing to allow a res ipsa loquitur instruction was advanced in *Republic L. & F. Co. v. Cincinnati,* 97 Ohio App. 532, 539, 127 N.E.2d 767 (1954). There the evidence demonstrated that the break occurred due to erosion caused by a scouring process resulting from the movement of adjacent soil, or from electrolysis caused by transient currents of electricity which originated from sources other than those controlled by the city. The latter cause removed any claim to the application of res ipsa loquitur.

Plaintiffs rely heavily upon *Adam Hat Stores v. Kansas City,* 316 S.W.2d 594 (Mo. 1958). *Adam Hat* sought compensation for damages due to a break in the city's water main located in a public street in front of the store. The trial court submitted the case to the jury under res ipsa loquitur. Neither the plaintiff nor the city knew the reason the main broke. The city's expert testified that cast iron mains could break as a result of excessive internal water pressure, excessive impact from traffic on the street above the pipe, settlement of soil, or electrolysis. The expert found the break in question did not occur from excessive pressure, impact of traffic or electrolysis. Although he thought the pipe could have broken because of uneven settlement of the soil, he could not reach any definite conclusion as to the cause.

The court found that res ipsa loquitur could be invoked because the pipe broke about halfway through its minimum life expectancy. Therefore, the pipe either had to be defective when laid, carelessly laid or maintained, subject to an external or

internal force that caused it to break, or as a result of the combination of any of these causes. According to the court, the city had exclusive management and control over the pipe and the break was one that ordinarily would not have happened, absent negligence. The court also rejected the city's argument that due to the lapse of time since the installation occurred and the difficulty of ascertaining the cause of the break, res ipsa loquitur should not apply because one of the essential elements of the rule is that the defendant possess superior knowledge regarding cause of the accident. The court stated:

"Surely, any supplier of water has or, in the exercise of ordinary care, should have superior knowledge or means of information as to the cause of a break in an underground water main installed and maintained by it in a street, over which it has exclusive control, than would an adjacent property owner, who could have none." 316 S.W.2d at 599.

The court also found that once it is determined that res ipsa loquitur raised a reasonable inference of negligence, the doctrine would not be removed because of the possibility the main broke for some other reason, as the plaintiff is not required to exclude every reasonable theory of nonliability on the part of the defendant.

*Adam Hat* is certainly distinguishable from the facts in this case in that the precise cause of the break in front of Sutton Place · has been ascertained both by testimony elicited by the plaintiffs and defendant. That is, it was caused by electrolysis, which corroded the pipe.

In *Pac. NW Bell v. Port of Seattle,* 80 Wash. 2d 59, 491 P.2d 1037 (1971), there was no direct evidence regarding the cause of a break in a water main, although there was testimony that it might have been caused by land settlement. Nevertheless, res ipsa loquitur was properly presented to the jury which returned a verdict for the defendant, thereby indicating that the defendant had apparently met its burden of demonstrating its freedom from negligence to the jury. Again, unlike the instant case, the cause of the break was unknown.

In *Kind v. Seattle,* 50 Wash. 2d 485, 312 P.2d 811 (1957), the cause of a break in a water main was not known and accordingly, res ipsa loquitur was properly invoked. In *Kind* the water main was shown to be under the exclusive control of the defendant city and the trial court had found as a fact that the break was of the

type which did not ordinarily occur absent negligence. The defendant city failed to prove its freedom from negligence.

Other cases cited in the annotations mentioned above supporting the applicability of res ipsa loquitur to cases involving breaks in water mains will not be mentioned here, as they are merely cumulative.

We cannot say from the evidence presented that the twelve-inch water main would not have broken except for an act of negligence on the part of the defendant. Accordingly, one of the elements that must be established before res ipsa loquitur may be applied, *i.e.,* that occurrence must be of such kind or nature as does not occur in the absence of negligence, was not met in this case. Additionally, even if we had found the doctrine applicable, under the general principles of res ipsa loquitur established by the Kansas courts in other types of cases, the plaintiffs provided evidence of the specific acts of negligence on the part of the defendant to such an extent that all of the facts and circumstances clearly established the precise cause of the break in the main which injured them. They proved the actual cause of the break was due to electrolysis and described the acts or omissions on the part of the City regarding inspection and maintenance of the main in question. Therefore, we find that the trial court did not err in refusing to instruct on the doctrine of res ipsa loquitur.

The plaintiffs next contend that the trial court erroneously refused to instruct the jury under the doctrine of strict liability, on the ground that the operation of water mains constitutes an abnormally dangerous activity justifying the imposition of strict liability. They rely upon the Restatement (Second) of Torts §§ 519, 520 (1977), and most particularly the cases of *Bridgeman-Russell Company v. City of Duluth,* 158 Minn. 509, 197 N.W. 971 (1924), and *Lubin v. City of Iowa City,* 257 Iowa 383, 131 N.W.2d 765 (1964).

The plaintiffs further advance their argument on public policy grounds. In view of several policies of the city water department, they assert it is only reasonable and equitable to expect the City to spread the cost of any injury caused to private property as a result of a broken main among its users as a cost of doing business. The cited City policies include (1) failing to replace mains in the downtown area, regardless of the number of breaks they have experienced, until the street is reconstructed above it; (2) utilizing

interconnected mains to insure adequate pressure in areas outside of the break area so that several mains or valves must be closed before the flow of water is stopped in the break area; (3) adding more pressure to the system when the pressure drops due to a break or fire, which pressure increases the possibility of a rupture with resultant serious harm.

Although the plaintiffs make some excellent points with respect to spreading the cost of the breaks among all the users of the system, in view of the facts in this case their arguments are not significant. For example, consider the first policy. There was substantial testimony that whenever a break in the downtown area occurred, pipe was exposed on both sides of the break until pipe of satisfactory condition was found to support a section of replacement pipe. Thus, the City did have some basis upon which to refuse uncovering the whole line when repairing the mains. With respect to the third policy or practice, there was testimony that a major fire might require increasing pressure in order to supply water to the area, and there was evidence that such a fire did occur the day before within five blocks of the break of the main in question. However, plaintiffs' expert could not unequivocally state that the firefighting activities on June 22 contributed to the break in the main, although it was possible.

The majority of courts have either held or tacitly assumed, in cases involving water escaping from water mains, that a distributor is not an insurer and before recovery may be allowed, negligence must be shown on the part of the distributor. (See Annot., 20 A.L.R.3d 1294, §§ 2[a] and 3[a].) *Bridgeman-Russell Company v. City of Duluth,* 158 Minn. 509, accepting the "dangerous instrumentality" doctrine of *Rylands v. Fletcher,*[1] L.R. 3 H.L. 330 (1868), is the leading case imposing strict liability where water escapes from a broken main. *Bridgeman-Russell,* however, may be distinguished on the ground that it involved the rupture of a twenty-inch water main which led from a primary reservoir located on the hilltop above the city. On appeal the court found that in a little over one hour, the main which broke could discharge as great a volume of water as the reservoir held.

Plaintiffs correctly argue that *Rylands v. Fletcher* has been

---

1. As *Fletcher v. Rylands,* in the Court of Exchequer, 3 H. & C. 774 (1865), and in the Exchequer Chamber, L. R. 1 Ex. 265 (1866), and as *Rylands v. Fletcher* in the House of Lords, L. R. 3 H. L. 330 (1868).

cited with approval in several Kansas cases. See, *e.g., Jones v. Hittle Service, Inc.,* 219 Kan. 627, 549 P.2d 1383 (1976); *State Highway Comm. v. Empire Oil & Ref. Co.,* 141 Kan. 161, 40 P.2d 355 (1935); *Berry v. Shell Petroleum Co.,* 140 Kan. 94, 33 P.2d 953 (1934). However, such an application has not yet been discussed in Kansas in the context of a broken water main. Furthermore, outside of *Lubin v. City of Iowa City* (Accord, *Iowa Power & Light Co. v. Bd. of Water Works, Etc.,* 281 N.W.2d 827 [Iowa App. 1979]), most courts have rejected the extension of the *Rylands v. Fletcher* doctrine to water main cases. Even *Quigley v. Village of Hibbing,* 268 Minn. 541, 129 N.W.2d 765 (1964), noted by the plaintiffs as citing *Bridgeman-Russell* with approval, more correctly seems to recognize the limits which had to be placed on the *Bridgeman-Russell* case. In *Quigley,* a four-inch service line ruptured and the court refused to find its operation an inherently dangerous activity.

In *McDaid v. City of Pendleton,* 4 Or. App. 380, 478 P.2d 642 (1970), the court held that the plaintiff's complaint alleging damage to his property as a result of water escaping from a broken water main did not state a cause of action under a theory of strict liability for the maintenance of an ultra-hazardous or abnormally dangerous activity by the defendant. The plaintiff had relied upon *Lubin v. City of Iowa City* and the Restatement of Torts § 520 (1938) for support. Oregon then did not strictly adhere to the Restatement definition of an ultra-hazardous activity (since revised in the Restatement [Second] of Torts [1977]). Rather, if an activity " 'is extraordinary, exceptional, or unusual, considering the locality in which it is carried on; when there is a risk of grave harm from such abnormality; and when the risk cannot be eliminated by exercise of reasonable care, the activity should be classed as abnormally dangerous. * * *' *McLane v. Northwest Natural Gas,* 255 Or. 324, 328, 467 P.2d 635 (1970)." *McDaid v. City of Pendleton,* 4 Or. App. at 383. The court in *McDaid* therefore held that maintenance of pressurized water mains is not an abnormally dangerous activity because there is nothing extraordinary, exceptional or unusual about it.

In *Pac. NW Bell v. Port of Seattle,* 80 Wash. 2d 59, the court found that the principle of liability without fault does not apply to broken water mains. It relied upon the Restatement (Second) of Torts §§ 519 and 520, and found that the system was not an

activity to be classified as abnormally dangerous. One rather significant factual distinction from this case was present: there had never been a break in the system before, absent an earthquake. However, the court also remarked the pipe could have been expected to last many more years, the system was one commonly used for fire protection, and its placement underground was appropriate. The court cited cases to support its position and noted that the number of jurisdictions opposed to imposition of strict liability outweighed those allowing it. See *Jennings Buick, Inc. v. Cincinnati,* 56 Ohio St. 2d 459, 384 N.E.2d 303 (1978).

The Restatement (Second) of Torts § 519 (1977), provides:

"(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

"(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous."

The factors to determine whether an activity is an abnormally dangerous one are contained in Restatement (Second) of Torts § 520 (1977). A review of those factors convinces us that the operation of the twelve-inch water main in question is not abnormally dangerous:

"(a) existence of a high degree of risk of some harm to the person, land or chattels of others;"

While there was testimony that there could be a risk of some harm to private persons as a result of a break in the Wichita water system, there was testimony that only twenty-five breaks had occurred in the fifteen-year period from 1958 to 1973. Although the number of breaks in the downtown area was greater than elsewhere, there was still no indication that the number was abnormally high when the total number of mains in the area were considered.

"(b) likelihood that the harm that results from it will be great;"

Although the damage to private interests could be great if a water main broke, there was testimony that for the most part damage to private property which had occurred as a result of other breaks in the water main had been rather minimal. Most of the escaping water would rise to the surface and be carried away by storm sewers.

"(c) inability to eliminate the risk by the exercise of reasonable care;"

Several witnesses testified that it would severely burden the City to visually inspect the water mains at regular intervals, as it would be necessary to dig through the streets to do so. However, whenever a break in a main did occur, the City, without fail, exposed sections of the ruptured pipe until pipe of satisfactory condition was found to attach to the replacement pipe.

"(d) extent to which the activity is not a matter of common usage;"

Apparently the comment to this factor, cited in part by the plaintiffs in their brief, describes the situation involved in *Bridgeman-Russell,* which has already been distinguished from this case. The common usage factor might better be weighed by considering other water distribution systems in use, even though this would involve a comparison beyond the immediate locality in which the injury occurred.

"(e) inappropriateness of the activity to the place where it is carried on; and
"(f) extent to which its value to the community is outweighed by its dangerous attributes."

The Restatement Comment (j) regarding factor (e) provides:

"So likewise, the collection of large quantities of water in irrigation ditches or in a reservoir in open country usually is not a matter of any abnormal danger. On the other hand, if the reservoir is constructed in a coal mining area that is honeycombed with mine passages, or on a bluff overhanging a large city or if water is collected in an enormous standing tank above the same city, there is abnormal danger and strict liability when, without any negligence, the water escapes and does harm."

The Comment further states that while the activity may be highly dangerous, it may be that it can only be carried on in a particular place. If the activity has sufficient value to the community, it may not be regarded as abnormally dangerous when so located because that might be the only place that the activity can be carried on. This observation is also applicable to factor (f).

The operation of the city's water system under the facts of this case does not constitute an abnormally dangerous activity and the trial court properly refused to instruct under the doctrine of strict liability.

Finally, the plaintiffs argue that their motion for new trial, filed upon a charge of juror misconduct, should have been granted by the trial court. Their specific contentions involve the alleged

statement made by the foreman Leo Moan in response to a question of Algie Hall, another juror, concerning what the others would do if a water main broke in front of their homes, that is, didn't they believe that they would be entitled to payment for the loss. Moan allegedly said: "I could not sue the city if something like that happened and sleep with my conscience." Later, the foreman allegedly stated that the jurors should remember that the City provided a necessary service in distributing water which they could not live without.

Plaintiffs argue that their first allegation of juror misconduct requires a new trial under the principles enunciated in *Walker v. Holiday Lanes,* 196 Kan. 513, 413 P.2d 63 (1966), and *O'Bryan v. Home-Stake Production Co.,* 195 Kan. 213, 403 P.2d 978 (1965). These cases provide prejudicial conduct warranting a new trial is to be found whenever a prospective juror, later selected as a juror, gives a false or deceptive answer to a question on voir dire pertaining to his qualifications. Such an answer deprives counsel of an opportunity to determine whether that prospective juror would be impartial. Here the precise questions to which the plaintiffs contend the foreman provided deceptive answers have not been stated in the briefs. The only real evidence to support plaintiffs is found on pages 15-16 of the transcript:

"The Court is going to instruct you, ultimately, that the standard of care imposed upon the City of Wichita or any other municipality in connection with the operation of a water system is the same standard of care that would be imposed upon a private company, like the Gas Service Company. I need to know if you have any problem—would you be possibly prejudiced against or in favor of the Defendant because it's a city? Does anybody have any problems along this line?"

There was no response to this question. The plaintiffs' citations to pages 38-39 and 41-42 of the transcript are unclear as it appears that all questions that might be construed to elicit any prejudice against or in favor of the city were directed to specific jurors rather than to the entire group.

Upon a review of the voir dire examination, Moan did not give a false or deceptive answer warranting the grant of a new trial. He was specifically asked by Hall whether he thought he should be entitled to be paid for the loss and was merely answering the question. Simply because he would not choose to sue the city in a situation somewhat analogous to the one the jury was deliberating upon is not necessarily an indication that he could not fairly

consider, in line with the court's instructions and with the evidence adduced at trial, whether the plaintiffs' clear right to sue in this instance should result in a verdict for them. By asking the question, Mr. Hall himself demonstrated that he was considering what he would do in such a situation. Therefore, the trial court did not abuse its discretion by refusing to grant a new trial with respect to that alleged incident of juror misconduct. K.S.A. 60-259.

Plaintiffs' second allegation of juror misconduct also involved the foreman, who reminded the jurors that they should recall that they could not live without the water distribution service provided to them by the City. In a recent pronouncement, *Verren v. City of Pittsburg,* 227 Kan. 259, 607 P.2d 36 (1980), the Supreme Court attempted to clarify its past decisions regarding juror misconduct, especially recognizing the need to harmonize them in light of K.S.A. 60-441 which prohibits impeachment of a jury verdict by inquiry into the mental processes of the jurors. In *Verren* the court reviewed some of the holdings from prior cases, and noted "the line of demarcation between what is and what is not admissible has been difficult to draw." 227 Kan. at 260-261. The court noted the traditional reasons for the rule, *i.e.,* finality of verdicts must be assured and the protection against the corruption of the jurors after discharge must be maintained.

Nevertheless, certain formalities of conduct could invalidate the verdict if violated.

"Evidence may be offered in such cases to impeach a verdict when the evidence will show actions of the jurors by which they have intentionally disregarded the court's instructions or violated one or more of the essential formalities of proper jury conduct." 227 Kan. at 261.

In *Verren* jury misconduct was established because the affidavits which disclosed that the jury had specifically apportioned attorney's fees as part of its total award of damages would, if proven, establish a conscious conspiracy by the jurors to disregard and circumvent the instructions that had been given by the trial court. Such an action would constitute a violation of the juror's oath.

The evidence in this case does not rise to the level of that described in *Verren v. City of Pittsburg.* Mr. Moan's statement appears fair comment about a matter that was totally within the knowledge of the jury, and there is no indication that that observation impaired his ability to decide the case. Further, it would

appear that it was fair comment in light of the instructions given by the court. In instruction No. 8, the court informed the jury how expert testimony was to be considered. In instruction No. 10, the jury was told that evidence was whatever was admitted at the trial as part of the record. And instruction No. 11 provided that the jury had the duty to determine the weight and credit to be given to testimony. The court further instructed: "You have a right to use that knowledge and experience which you possess in common with men in general, in regards to the matter about which a witness has testified." In instruction No. 12, the jury was admonished to lay aside its prejudices and to determine the truth on the basis of the evidence considered in light of the instructions of the court.

The comment made by Moan regarding the City's distribution of water was certainly a matter of common knowledge possessed by all of the jurors. Furthermore, the fact was acknowledged time and again during the proceedings. Members of the water department and the fire department explained why the system was designed as it was, how service was provided to the entire city, how the City had assumed control over the water distribution system some years earlier, etc. Moan's comment did not, as the plaintiffs allege, inject a new issue into the case. All of the jurors knew that they were dependent upon the City for water distribution. Even if Moan's conduct might be determined improper, it does not seem of sufficient magnitude to warrant grant of a new trial. See *Dunn v. White,* 206 Kan. 278, 479 P.2d 215 (1970).

Judgment is affirmed.