**JETCRAFT CORPORATION, a Delaware Corporation; Insurance Company of North America, a Pennsylvania Corporation; Delta Commercial, C. por A., a Foreign Corporation; and Transporte Aero, S.A., a Foreign Corporation, Plaintiffs,**

v.

**FLIGHTSAFETY INTERNATIONAL, INC., a New York Corporation; and Wesley D. Kimball, an Individual, Defendants.**

No. 89–1596–K.

United States District Court,
D. Kansas.

Nov. 27, 1991.

John Scott Hoff, Brandt R. Madsen, Lapin, Hoff, Slaw & Laffey, Chicago, Ill., Scott Gunderson, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan., for plaintiffs.

John C. Nettels, Jr., Matthew D. Flesher, Morrison, Hecker, Curtis, Kuder & Parrish, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

On December 10, 1988, a Cessna 650 owned by plaintiff Jetcraft made its final approach toward Runway 31 of the Hutchinson Municipal Airport. Johnny De Los Santos, a commercial pilot licensed by the FAA and employed by Transporte Aero, S.A., sat in the left-hand front seat of the aircraft and conducted the final approach. Beside him, in the right-hand front seat, sat Wesley D. Kimball, a flight instructor for defendant FlightSafety International, which had agreed to provide flight training for De Los Santos and the other passengers in the plane: Javier Vargas, Jose Gomez, and Jose Aruro Jiminez. At the time of the final approach, Vargas was also in the cockpit, sitting in the jump seat immediately behind Kimball and De Los Santos.

De Los Santos approached the field to conduct a "touch and go" landing under the supervision of Kimball. In a "touch and go" landing, the airplane is landed but not brought to a full stop. Instead, full power is applied to allow the aircraft to take off again.

As De Los Santos maneuvered the plane for its final approach, Kimball, as the pilot in the right-hand co-pilot seat, was the person responsible for the extension of the flaps and landing gear. De Los Santos called for Kimball to extend full flaps. Kimball complied, extending the flaps.

De Los Santos then called for Kimball to lower the landing gear. Kimball moved the landing gear handle to the down position. The red "gear unlocked" light on the instrument panel illuminated. A few seconds later, the landing gear extended and three green landing gear annunciator lights illuminated while the red "gear unlocked" light extinguished. The three green lights indicated to the pilots that the left, right, and nose landing gear were extended and locked in place. Kimball told De Los Santos, "Down and three green lights." De Los Santos replied: "Check."

De Los Santos noticed that his final approach, as indicated by the visual approach slope indicator, was a little high. He then descended to an appropriate position. Intending to reduce power on the airplane to idle when the plane descended to 50 feet, De Los Santos told Kimball to make an altitude call when the airplane reached that altitude. As the plane descended, Kimball confirmed on two separate occasions that the three landing gear lights continued to glow.

A slight crosswind of five to seven knots blew from the right side of the runway. De Los Santos gave the plane a slight amount of right rudder to correct for the wind. As the plane touched down, the left landing gear collapsed. Inside the cockpit, the landing gear unsafe horn sounded. The green landing light for the left landing gear no longer glowed green.

De Los Santos tried to advance the throttle to add power to the plane, which at this time was traveling at almost 90 knots. Vargas, seeing De Los Santos try to add power, warned, "We are crashing, pull the power back." But, immediately after the landing gear safe horn sounded, the left wing touched the runway. The aircraft veered off the runway and came to a stop after hitting the frangible light stanchions lining the runway.

Jetcraft has now brought the present action, in which it seeks recovery for the damage to the Cessna 650. In the present motion, Jetcraft seeks a determination that defendant FlightSafety, and its agent Kimball, owed it a duty of due care, that the defendants breached this duty, and that the breach was the proximate cause of the damages to the Jetcraft airplane. In support of its motion, Jetcraft argues that the doctrines of collateral estoppel, negligence per se, and *res ipsa loquitur* support each of the determinations of duty, breach, and proximate cause.

■ Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party, *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

■ In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply

show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The parties disagree as to the cause of the accident. Jetcraft suggests that it was the fault of Kimball, who somehow retracted the landing gear after initially placing the gear into the down and locked position. In support of this suggestion, Jetcraft points out that the landing gear extended and retracted a number of times before the accident without any abnormality. It further points to the results of a National Transportation Safety Board Factual Report of the accident, which stated:

"Extensive testing over a three month period failed to produce any evidence of any malfunction of the landing gear system or related components which could have resulted in a [sic] unlocked condition of the main landing gear."

FlightSafety denies the suggestion that the failure of the landing gear was caused by Kimball, and the suggestion that there was nothing defective in the gear. Kimball expressly denies moving the landing gear handle after the gear was first down and locked. Jetcraft has provided no direct evidence contradicting this denial. Indeed, during a post-accident discussion with Jetcraft officers, De Los Santos stated that he did not see any movement of Kimball's arm during the accident sequence, nor did he see Kimball move the landing gear handle during the accident sequence.

The Cessna 650 which is the focus of the present case had made 464 takeoff and landing cycles prior to the December 10, 1988 accident. Both parties dispute the status of discovery with regard to prior landing gear failures during the prior flight history of the Cessna 650. The defendants aver in their response that no formal discovery has been conducted on the issue. Plaintiff Jetcraft denies this. Neither side supports its position with reference to evidence in the record. On the other hand, the record does establish that, just four days prior to the accident, a maintenance report for the aircraft indicated "landing gear light inoperative." [1]

Finally, in connection with the National Transportation Safety Board test results, FlightSafety points out that the tests do not establish that there was nothing mechanically defective in the landing gear assembly, only that the NTSB was unable to find evidence of a malfunction. Moreover, certain test results indicate problems with the landing gear assembly. In attempting to extend the landing gear actuator to the point which would cause the green down and locked indicator lights to glow, engineers were unable to achieve positive results on the first two occasions. On the third attempt, engineers were able to obtain a down and locked indication—by the application of a tensile load of 4,700 pounds, over 100 times the force load normally necessary to get the gear down and locked.

Kimball, De Los Santos, and Vargas each had prior flight experience. Both De Los Santos and Vargas were commercial pilots licensed by the FAA and employed by the plaintiff Transporte Aero, S.A. De Los Santos had some 2,600 to 2,700 total flying hours as a pilot, including 450 to 500 hours as a pilot in command of jet aircraft. Vargas had some 3,150 total flying hours as a

---

1. Jetcraft notes that maintenance workers replaced a landing gear light, and that as a result, "the system was fully operational four days later." (Pltf's Reply, at 15). Jetcraft, however, does not bother to provide any evidentiary support in its reply for the conclusion that the system was "fully operational." The coincidence of a problem with the landing lights, so shortly before the accident, when coupled with an absence of any direct evidence of negligence by Kimball, helps to create a clear issue of material fact as to the cause of the accident.

pilot, including 1,600 to 1,700 hours as a pilot in command of jet aircraft.

Kimball has been a flight instructor since 1946. He began work for FlightSafety as a simulation instructor in April, 1986, and as a flight instructor in January, 1987. Kimball has some 9,000 hours of pilot in command experience.

### 1. *Collateral Estoppel*

■ Jetcraft argues that Kimball and FlightSafety are collaterally estopped to argue the issues of duty, breach, and causation owing to the results of FAA proceedings after the December 10, 1988 crash. Jetcraft argues that prior proceedings before the FAA preclude the relitigation of the issues relating to the defendant's alleged violation of FAA regulations.

On May 19, 1989, the FAA sent Kimball a notice of proposed certificate action, in which Kimball was alleged to have violated 14 C.F.R. §§ 61.57(c) & 91.9. Section 61.-57(c) provides in part:

> No person may act as a pilot in command of an aircraft carrying passengers, nor of an aircraft certificated for more than one required pilot flight crewmember, unless within the preceding 90 days, he has made three takeoffs and three landings as the sole manipulator of the flight controls in an aircraft of the same category and class and, if a type rating is required, of the same type.

On the other hand, 14 C.F.R. § 91.13(a) [the precursor of § 91.9] provides that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another."

On May 23, 1989, Kimball requested an informal conference to consider the allegations. The informal conference was held between Kimball and FAA personnel on June 22, 1989. As a result of this conference, the FAA found that Kimball had violated § 61.57(c) and suspended Kimball's certificate for 60 days. The allegation of a violation of § 91.9 was dropped.

On May 26, 1989, the FAA sent a notice of proposed civil penalty to FlightSafety, alleging the violation of § 91.9 on the basis of Kimball's supposed failure to have the level of prior flight experience required by § 61.57(c). On June 14, 1989, FlightSafety paid the proposed civil penalty by sending a check in the amount of $1,000.00 to the FAA.

Jetcraft's attempt to establish collateral estoppel with regard to the FAA proceedings should be rejected. Jetcraft was not a party to those proceedings, nor was it in privity with a party. Accordingly, due to this lack of mutuality, Jetcraft is not entitled to claim preclusive effect for any issues determined during the course of the proceedings.

In its reply, Jetcraft attempts to argue that FlightSafety is collaterally estopped from disputing the findings of a violation of § 61.57(c), even though Jetcraft was neither itself a party nor in privity with a party to the earlier FAA proceedings against Kimball and FlightSafety. On the basis of an isolated comment in *Goetz v. Board of Trustees*, 203 Kan. 340, 349, 454 P.2d 481 (1969), Jetcraft argues that mutuality of parties is not required for the use of collateral estoppel under Kansas law.

In describing the distinctions between *res judicata* and collateral estoppel, the court in *Goetz* stated in passing:

> Another distinction between the two doctrines, *res judicata* and collateral estoppel, is that collateral estoppel does not require mutuality of parties.

203 Kan. at 349–50, 454 P.2d 481 (citation omitted). This comment by the court was clearly dicta. The court also held directly that collateral estoppel "prevents a second litigation of the same issues between the same parties or their privies." *Id.*, at 349, 454 P.2d 481. The court found that, for purposes of resolving a widow plaintiff's rights to the pension of her deceased husband, the wife should be considered as in privity with the husband, and hence collaterally estopped from relitigating issues initially raised by the husband in earlier proceedings.

The suggestion in *Goetz* that collateral estoppel does not require mutuality of parties has found no further support in the

rulings of Kansas courts. Rather, the Kansas Supreme Court has consistently required, as a prerequisite to the use of collateral estoppel, that the parties of the subsequent litigation be identical to or in privity with parties in the earlier action. *Jones v. Bordman*, 243 Kan. 444, 460, 759 P.2d 953 (1988); *Jackson Trak Group, Inc. v. Mid States Port Auth.*, 242 Kan. 683, 690, 751 P.2d 122 (1988); *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 732 P.2d 741 (1987); *McDermott v. Kansas Public Serv. Co.*, 238 Kan. 462, 712 P.2d 1199 (1986); *Wells v. Davis*, 226 Kan. 586, 603 P.2d 180 (1979); *Neville v. Hennigh*, 214 Kan. 681, 522 P.2d 443 (1974); *Bud Jennings Carpets & Draperies v. Greenhouse*, 210 Kan. 92, 499 P.2d 1096 (1972). The supreme court in *McDermott* explicitly concluded that "abandonment of the mutuality rule, it seems to us, would be unfair." 238 Kan. at 473, 712 P.2d 1199. In *Jones*, the court reached the same conclusion, stating that, under Kansas law, "collateral estoppel, or issue preclusion, require[s] mutuality, i.e., the issue subject to preclusion must have arisen in a prior case in which both of the current parties were adequately represented." 243 Kan. at 460, 759 P.2d 953.

· Faced with such consistent and explicit adherence to the rule of mutuality, for the plaintiffs to suggest herein—on the basis of an isolated comment in dicta in an early case—that mutuality is not required is quite remarkable.

■ In addition to the lack of mutuality, Jetcraft's collateral estoppel argument fails since the prior adjudication did not provide a sufficient level of formal protections and procedures to warrant giving its findings preclusive effect. Although adjudicative determinations of an administrative agency

may be given preclusive effect where the "agency conducts a trial-type hearing, makes findings, and applies the law," no preclusion will occur where the formality of the proceedings before the agency is sufficiently diminished. *Neunzig v. Seaman U.S.D. No. 345*, 239 Kan. 654, 659, 722 P.2d 569 (1986) (quoting 4 Davis, *Administrative Law* § 21:3 (2d ed.1983)). In *Neunzig*, the court held that collateral estoppel was justified where the prior determination was made by an administrative "hearing committee possess[ing] many of the functions associated with court proceedings" and "the type of procedural protection a court provides." *Id.*, at 660, 722 P.2d 569.[2]

In the present case, Kimball was not accompanied at the informal hearing held on June 22, 1988 by an attorney. Nor was any hearing officer or administrative law judge present. The only persons attending the meeting were Kimball, an FAA attorney, and two FAA investigators. The FAA memorandum reflecting this hearing itself reflects the informal nature of the proceedings, which it refers to as an "INFORMAL CONFERENCE."

Jetcraft notes that under 14 C.F.R. § 13.19(c)(5), a pilot subjected to possible certificate action is not limited to an informal conference on the matter but may request a formal hearing. A formal hearing allows for the taking of depositions, subpoena of witnesses, examination of witnesses under oath, cross-examination by the respondent, "adequate opportunity to present arguments." *See* 14 C.F.R. §§ 13.37–63.

■ But the issue for which Jetcraft seeks preclusion here was not resolved by means of a formal § 13.19(c)(5) proceeding, with all the protections accorded therein.

---

**2.** The *Neunzig* court detailed the procedural rights extending to teachers appearing before the administrative hearing committee earlier in its opinion:

At the due process hearing, the teacher and Board may be represented by counsel, may cross-examine each other, may present witnesses, and may testify on their own behalf. The hearing committee is empowered, when authorized by a majority of the committee, to administer oaths; issue subpoenas; authorize the tak-

ing of depositions; receive evidence; limit lines of questioning and testimony; call and examine witnesses; introduce documentary and other evidence into the record; regulate the course of the hearing; dispose of procedural requests, motions, and similar matters; and take any other action necessary to make the hearing accord with procedural due process.
239 Kan. at 657, 722 P.2d 569 (citations omitted).

Rather, the issue was resolved by an informal conference, a proceeding which simply does not rise to a sufficient level of formality to support collateral estoppel. Kimball may have had the right to request a different type of tribunal, but that is not relevant. The purpose of collateral estoppel or issue preclusion is to prevent the relitigation of issues of fact or law which were *actually considered* by a former judgment. Restatement (Second) of Judgments § 38 (1982). Accordingly, in determining whether the formality accorded in the prior proceeding was sufficient to justify preclusion, the focus should be on the protections and procedures of the tribunal which *actually resolved* the issue, and not the protections accorded under other types of proceedings which could have—but were not—used to resolve the issue.[3] Jetcraft has failed to provide any evidence or argument that the informal conference conducted on June 22, 1988 was of sufficient formality to justify the imposition of collateral estoppel.

█ In addition to the lack of mutuality, and the informal nature of the FAA proceedings, Jetcraft's arguments of collateral estoppel must fail for a final and independent reason. As noted above, collateral estoppel bars claims which were actually litigated between the parties. Jetcraft seeks a determination that Kimball violated 14 C.F.R. § 61.57(c) (by conducting the December 10th training flight without sufficient flight experience), while FlightSafety violated 14 C.F.R. § 91.9 (by operating an aircraft in a careless or reckless manner).

Yet in the earlier proceedings before the FAA, that agency made no findings of a violation as claimed by Jetcraft. The citation against FlightSafety was derivative only, premised on the allegedly wrongful actions of Kimball. As to Kimball, the FAA dropped the allegations of careless or reckless flight operation in violation of § 91.9. The only direct findings in the case relate to § 61.57(c). As to that provision,

the FAA found Kimball had the necessary flight experience, and premised its temporary suspension of Kimball's certificate on the mere fact that the paperwork reflecting the experience was insufficient:

> Mr. Kimball had made the appropriate number of simulator takeoffs and landings required by [Exemption] 4058 and met all other requirements. However, training records were not completed to show such and there was no certification by another instructor that simulator training was completed.
>
> ... [T]he takeoffs and landings were satisfactorily completed but were performed without other Flight Safety personnel present to witness or conduct a proper review for certification.... As such, it was agreed that the FAA should proceed with a violation of 61.57(c) but drop the 91.9 violation, in that, on this occasion, noncompliance with the certification and record-keeping functions of the exemption alone did not endanger the lives or property of others.

(FAA Memorandum of Informal Conference June 22, 1989.)

The FAA's finding of a violation of § 61.-57(c) related solely to record-keeping requirements, and explicitly that Kimball had the requisite flight experience. It also explicitly found that the violation of record-keeping requirements did not affect the safety of the lives or property of others. Jetcraft's attempt to establish the FAA adjudication as a finding of fault which is in any way relevant to the issues in the present action is clearly unwarranted.

Jetcraft, in attempting to salvage its claim of collateral estoppel, argues in its Reply that § 61.57(c) contains no independent paperwork requirements. Apparently Jetcraft is attempting to argue what the FAA should have found. In so doing, Jetcraft seeks to have its cake (the preclusive effect of a finding of a violation of FAA requirements) while eating it too (by wholly

---

3. Thus, in *Neunzig,* the court resolved the question of whether to grant collateral estoppel not on the basis of protections accorded under alternative methods of adjudication (such as subsequent complaint before the state civil rights commission or subsequent appeal to state district court). Rather, it focused solely on the protections accorded under the tribunal which actually resolved the issue for which preclusion was sought: the hearing committee of the local board of education. 239 Kan. at 660, 722 P.2d 569.

ignoring the explicitly stated reasons for the FAA's findings).

The FAA finding that Kimball violated § 61.57(c) establishes nothing that has any relevance in the present action. Nor does FlightSafety's payment of the $1,000.00 civil penalty establish issue preclusion as to any relevant matter. The claims against FlightSafety were limited to derivative claims arising from the actions of Kimball.

FlightSafety paid the civil penalty prior to the resolution of the charges against Kimball. The May 26 notice of proposed civil penalty merely alleges that FlightSafety violated § 91.9 by Kimball's alleged failure to have the flight experience required by § 61.57(c). Other than the mere fact of the proposed finding and the subsequent payment, there is no other evidence before the court. Faced with this absence of any direct admission by FlightSafety, collateral estoppel is not justified. And, in any event, the absence of mutuality again prevents the application of collateral estoppel on the basis of the payment of the civil penalty.

### 2. *Negligence Per Se*

Jetcraft next argues that even if Kimball and FlightSafety are not collaterally estopped from contending that they complied with FAA regulations, the undisputed material facts nonetheless demonstrate a violation of the regulations, and hence constitute negligence per se. Jetcraft argues that Kimball, as the pilot in charge of the aircraft, was ultimately responsible for the safety of the flight. 14 C.F.R. § 91.3 (1988). Under 14 C.F.R. § 91.3(a) (1990), "the pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft."

As the cases cited by Jetcraft, *Hayes v. Unites States*, 899 F.2d 438 (5th Cir.1990); *AAR Corp. v. United States*, Case No. 6–2781–W (W.D.Okla. Nov. 30, 1987), clearly establish, the pilot in command assumes a duty for proper control of the plane, but is not made thereby a guarantor of the safety of the flight. Independent evidence is required to demonstrate breach of the duty and that that breach was the proximate cause of the plaintiff's injuries.

Here, the record does not establish beyond a reasonable doubt that the crash of the Jetcraft Cessna 650 was caused by a failure of Kimball to properly assume the duties of pilot in command. As noted earlier, the parties present different theories as to the cause of the crash. According to FlightSafety, the crash was caused by some malfunction of the plane's landing gear. According to Jetcraft, the crash was caused by Kimball's failure to operate the landing gear properly. Jetcraft's theory is an inference, based upon an alleged lack of defect in the landing gear assembly.

That inference is not sufficient to justify the imposition of summary judgment. The true, and potentially defective, state of the landing gear assembly remains disputed by the parties and unresolved in the evidentiary record. Moreover, Kimball has directly and affirmatively denied any error with regard to the operation of the landing gear. Accordingly, summary judgment should not issue. With regard to the supposed violations of FAA regulations §§ 61.57(c) and 91.9, as noted earlier, the present state of the record supports at best the conclusion that the defendants, while failing to comply with certain documentary or certificatory requirements of the regulations, adhered to the substance of the regulations requiring minimum prior flight experience.

### 3. *Res Ipsa Loquitur*

Finally, Jetcraft suggests that Kimball and FlightSafety may be found to have breached their duty of due care under the doctrine of *res ipsa loquitur*. That doctrine, however, is not implicated in the present action since it requires that the instrumentality causing damage to the plaintiff be in the exclusive control of the defendant. Although Kimball, as pilot in command of the aircraft, had the authority to control the flight operations of the aircraft, he did not have exclusive control over the aircraft as that term is used for purposes of establishing *res ipsa loquitur*.

There is no evidence that, merely because Kimball was the pilot in command of the aircraft during the December 10, 1988 training flight, he also had sole control over the design, construction, and maintenance of the landing gear assembly. As a prerequisite to the use of the doctrine of *res ipsa loquitur,* the proximate cause of the plaintiff's damages must be determined. *John T. Arnold Assoc. v. City of Wichita,* 5 Kan.App.2d 301, 615 P.2d 814 (1980). In this case, however, the proximate cause of the crash of the aircraft is not known at the present time, and must await determination at the trial of the present matter.

#### 4. *Motion to Supplement*

As a final matter, Jetcraft has moved to supplement its motion for summary judgment on the basis of a June 9, 1989 letter from the FAA. The letter bears upon the existence of Exemption 4058, which allows FlightSafety to count pilot simulator time toward the amount of flying time required by instructors under § 61.57(c). Jetcraft apparently seems to advance the position that the exemption does not exist.

In response to a Freedom of Information Act request by counsel, an FAA manager writes in the June 9 letter: "In reviewing our files, we do not show any documents or correspondence written to FlightSafety or to Mr. Wesley Kimbell [sic], relating to waivers from Section 61.57(c)."

The motion to supplement will be denied. The letter does not establish that the exemption does not exist (as Jetcraft purports). It merely states that the FAA was not able to locate the documentation on the exemption. FlightSafety, on the other hand, attaches to its memorandum in opposition a copy of the exemption. The exemption is repeatedly referenced in other FAA correspondence. The suggestion that, despite all this, the exemption is imaginary is not warranted given the unsworn, ambiguous, and limited nature of the June 9 letter. Consequently, the motion to supplement will be denied.

IT IS ACCORDINGLY ORDERED this 26th day of November, 1991, that plaintiff Jetcraft's motions for partial summary judgment and to supplement (Dkt. Nos. 52 & 53) are hereby denied.

This matter is now scheduled for a further status conference on January 6, 1992, at 11:30 a.m.